**UNITED STATES ex rel. ALMEIDA v. BALDI et al.**

No. M–1383.

United States District Court
E. D. Pennsylvania.

May 15, 1951.

11. 14 Tex.Jur. 640, Sec. 798.

12. 14 Tex.Jur. 644, Sec. 801.

Michael von Moschzisker, Philadelphia, Pa., for plaintiff.

Randolph C. Ryder, Deputy Atty. Gen., James W. Tracey, Jr., First Asst. Deputy Atty., Colbert C. McClain, Asst. Deputy Atty., G. A. Gleeson, U. S. Atty., Philadelphia, Pa., for defendants.

WELSH, District Judge.

This case was brought into the United States District Court by petition for a writ of habeas corpus. The relator alleges his rights under the 14th Amendment of the Constitution of the United States have been violated. The writ of habeas corpus was the greatest concession wrung from a tyrant king at Runnymede in 1215. Through the centuries it has stamped Anglo-Saxon jurisprudence as a citadel of protection for human rights. It is not technical and does not raise technical questions which are raised by various forms of appeal. It was deemed so important to the founders of our republic that it was written into the Bill of Rights of our Constitution. Its enforcement was left, so far as finality is concerned, to the Federal Courts for reasons which can very well be understood. Federal Courts do not entertain jurisdiction in matters of habeas corpus until *all State remedies* under State legislation and State Constitutions have been exhausted. The Supreme Court of the United States in setting aside State Acts in violation of the United States C onstitution does so only after the highest State tribunal has acted.

In discussing the various features of this. case we feel it proper and desirable to refer to the above principle that governs jurisdiction. We do so because of the fact that in recent times there has been a great deal of confusion and misunderstanding on the part of the general public as to why and how these questions come to the Federal Courts for decision. The increase of crimes of violence, the ramifications of the under-world in high and low places, the corruption and debauchery of public officials has so exasperated our people that they have become impatient and highly critical of anything that impedes or delays outraged justice in seeking vindication. We can sincerely sympathize with the public in this attitude and must reluctantly confess that at times we are conscious of the same feelings ourselves. But centuries ago our civilization erected special fundamental safeguards to protect the weak from the strong, the good from the cruelties of the tyrant, the innocent from the crafty cunning of the evil. The outraged justice of the moment and the healthy desire to swiftly punish the criminal must not set aside those safeguards that are necessary for the security of us all. In our many years of experience as prosecutor and judge we have never found a case where it was necessary to violate the constitutional safeguards in order for the State to obtain justice. What is the question raised in this habeas corpus proceeding?

1. On January 30, 1947 the relator, David Almeida, in company with two other men, Edward Hough and James Smith, robbed a super-market on Fairmount Avenue, west of 19th Street. They were armed

with guns of the following caliber—two guns of .45 caliber and one of .22 caliber. Shots of .45 caliber were fired in the ceiling of the super-market. The excitement brought a crowd of people and the police and quite a number of shots were fired outside the super-market. The robbers attempted to get away in the automobile provided for that purpose. One of the robbers, Smith, was wounded in the forehead, a flesh wound. Officer Ingling was in citizen clothes and had come to the store with his wife to shop. He was near Almeida and during the shooting he fell to the ground instantly killed. A bullet had gone completely through his head. The robbers got away. Hough fell out of the car and was captured. Almeida was arrested some months later in the West after having robbed a bank down in New Orleans. He was brought back for trial. In the meantime Hough had been tried. At the trial of Almeida the State produced a number of lead bullets and fragments of bullets. The Court and Jury were led to believe that all the evidence had been produced before them. But there was one bullet in the possession of the State that the State did not produce. It is upon this bullet that the entire case rests. We will state here that all the evidence produced before us came from the State's own witnesses. Therefore, the State cannot claim that this is a dispute between the evidence produced by the two parties at the trial. Officer Ahrndt testified that he hastily rushed to the scene of the crime and got there shortly afterwards and started to look for every bit of evidence. He found the bullets and fragments of bullets we have referred to above. But about 15 feet from where the head of the unfortunate Ingling was lying he found a bloody lead bullet of *.38* caliber. It was not fragmentized but distorted in shape showing that it had come in contact with some hard substance. He carefully wrapped it up in a piece of paper and took it to Officer Spangler at headquarters. Officer Spangler is the ballistic expert of the County of Philadelphia, Bureau of Police. Officer Spangler weighed the bullet, measured it, certified that it was of .38 caliber, and had the State chemist make an analysis of the stains on the bullet.

The State chemist officially certified that the stains were bloodstains. The police made proper records of all that they did. Justice and fair play require us to absolve the police of any irregularity or any improper conduct in this whole affair. How far it became their duty to officially inform the trial Judge of this evidence is not for us to say. The District Attorney is properly looked to by the police for guidance and instructions in criminal trials. We leave to the local police authorities the question of how any such incident should it ever arise again should be met.

2. At the Coroner's inquest this bloodstained bullet was not produced nor was any reference made to it in any manner. Neither the Coroner nor the Coroner's physician had any knowledge of it and the Coroner completed his autopsy completely ignorant of this important piece of evidence. The autopsy showed that the bullet that penetrated Officer Ingling's head was .38 in caliber. It was admitted that the police are armed with this type of gun, .38 in caliber and using a lead bullet.

3. When the District Attorney came to prepare the case for trial he sent for all the witnesses who were known to have any knowledge of the crime. The police called attention to their possession of this bloodstained bullet and the chemical analysis of the stains. The police were told by the District Attorney that it was not necessary for them to produce this at the trial. The police did not produce this at the trial. Counsel for the defendant had no knowledge of the existence of the bullet or its history. The record shows that the trial Judge at the trial did not have the matter of the bullet called to his attention by the District Attorney. Counsel for the defendant could not call for its production, having no knowledge of its existence, and the Court having no knowledge could not rule upon its admission or exclusion. Neither could the Appellate Court. The case went to trial on the evidence and theory of the State that Almeida had fired the shot that killed Ingling and asked the jury to so find. The State produced Hough, the co-defendant. Hough at his own trial swore that he did not know who fired the

fatal shot. At the trial of Almeida he testified that he, Hough, was standing alongside of Almeida and that Almeida within two feet of Ingling fired the fatal bullet and stated "I got the son of a bitch". But the gun that Almeida had was of .45 caliber. The .45 caliber bullet Almeida fired into the ceiling of the super-market was not produced at the trial. Its production would have been persuasive with the Jury because it is admitted that Almeida fired the .45 caliber bullet into the ceiling. It was a steel jacketed bullet of .45 caliber and was produced before us and no explanation as to why it was suppressed at the trial. The hole in the head of Ingling was made by a .38 caliber bullet.

4. The existence of the bloodstained bullet was not discovered until the co-defendant Smith came to be tried. How counsel for defendant learned of this most important piece of evidence was not brought out. Right here we must call attention to a significant and sinister piece of testimony. At the trial of Smith, Almeida having been tried and condemned to death, counsel for Smith subpoenaed Officer Spangler and Officer Ahrndt who had personal and official knowledge of the bloody bullet. The District Attorney told Officer Spangler that if the defendant's lawyer called him to the stand he was not to say anything about the bloody bullet. The officer protested against such instructions and said he would not do anything of the kind; that he had made his report in writing, and that he had a chemical analysis of the bloodstains, and if he was asked he would state the facts. At the trial of Smith the *defense* subpoenaed these officers. The Assistant District Attorney put Lieutenant Spangler on the stand but did not interrogate him about the bloody bullet. The defense then brought it out on cross examination of Lieutenant Spangler. Only after that did the Assistant District At-

torney put Detective Ahrndt on the stand and ask him about the bullet. It is significant, but not controlling, that the jury that tried Smith, who was a co-defendant in the same murder, having the evidence of the bloody bullet before them found Smith guilty of murder in the first degree, which is in accordance with the law of Pennsylvania.[1] But they fixed the penalty at life imprisonment rather than death. We want to make it clear that this proceeding under habeas corpus is not to question whether or not under the law of Pennsylvania Almeida should have been recommended for life imprisonment rather than the penalty of death. This Court has nothing to do with that phase of the question. Under the law of Pennsylvania all killings that result from a robbery of this kind are murders in the first degree. But under the Pennsylvania law the jury has the responsibility in a first degree murder of this type of saying whether the defendant merits death or life imprisonment. What the jury does on that question depends upon the facts of the case as submitted to them. Could a jury possibly do its full duty and fairly decide between life and death in a case without having presented to it the facts and history of this bloody bullet? Had those facts been presented to it and had they found the defendant in their opinion deserving of death, there would have been no constitutional question for this Court to pass upon. The sole question is whether or not a prosecuting officer can conceal and withhold from a trial judge and a trial jury evidence which under the law is the very basis of their findings as to whether the defendant should suffer death or life imprisonment. The State claims that he can. But since when have we seen fit in this country to leave such questions to the whim, the caprice, the hatred, or the favor of a prosecuting attorney? Under such a theory a trial would be a farce and justice

1. Counsel for relator submitted affidavits from ten of the jurors who tried Almeida to the effect that if they had known the facts in connection with the bloodstained bullet they would have brought in a verdict of life imprisonment instead of death. We rejected this evidence because in our opinion it would be a dangerous precedent to permit jurors, after a verdict is rendered, to explain away what they did or did not do and why. It would subject them to coercion and bribery and would be subversive of the true principle of trial by jury.

a jest. It would be a trial by Attorneys General and District Attorneys and not by a Court of Justice. There are several methods by which a prosecuting officer can throw a case or get an unconstitutional conviction. One is by withholding information in *favor* of the Government, causing a favored defendant to be acquitted. This results in a detriment to the State. Another method of injustice is in the production of false or perjured testimony. We have seen some tragic examples of that in Philadelphia County very recently. Another method, equally monstrous, is to withhold evidence favorable to the defendant. That method was resorted to in this case. Our people are informed through the press that such practices are followed in some other lands and we are justly shocked at some recent instances abroad of political injustice. Yet right here at home we not only have discovered that it was secretly practiced but in these proceedings a Court is asked to impress such a travesty with the stamp of judicial approval and constitutional sanctity. Can an American Court proclaim to the world that this is our concept of due process of law? This is the first time throughout the history of this case that any Court has had the opportunity to pass upon the *merits* of the question. Now that all the facts, based on sworn testimony, are set forth this Court and Appellate Courts can pass upon the case knowing with certainty what the truth really is.

5. When we consider the multiplicity of criminal offenses due to economic changes in our civilization, when we reflect on the tremendous power of Government to obtain possession, at times exclusive possession, of the evidence in a criminal prosecution, when we consider that the heavy hand of Government can and does seize books, papers, records, and remove them from the very defendants themselves we can realize how important it is to require the Government through its prosecuting officials to have absolute good faith and fidelity to the Court and to the jury trying the case. It is of the utmost importance to every citizen of our country today for the Courts to strike down all attempts to resort to such an unwarranted use of despotic power. Such a policy would leave the trial Judge and Jury not informed of the facts, with no ruling possible by the trial Court or Appellate Court on matters withheld. Can any one seriously claim that this is in accordance with American principles of justice or that it does not present an *unusual* reaching for power that is ruthless, arbitrary, brutal and unconstitutional. Again we say, in all our experience over a long period of years in the very office involved (the office of District Attorney) we never knew or heard of such a claim of arbitrary power on the part of the public prosecutor. Such a claim stamps this case as most unusual and brings it in the class of cases subject to Federal review.

In addition to the facts set forth in the foregoing parts of this discussion, which are adopted as final to the extent that they are free of minor inconsistencies, we make the following *further*

## Findings of Fact.

1. The case is extraordinary. Ex parte Hawk, 321 U.S. 114, 118, 64 S.Ct. 448, 88 L.Ed. 572.

2. The circumstances were exceptional and the urgency peculiar when the jurisdiction of this Court attached (the hour fixed for execution was imminent). Darr v. Burford, 339 U.S. 200, 219, 70 S.Ct. 587, 94 L.Ed. 761.

3. The wound of entrance in the bony structure of Ingling's head was ten millimeters in diameter (N.T. 391).

4. This wound could not have been made by a .45 caliber bullet, a bullet of that size being too large in diameter (11.2 or 11.4 millimeters) (N.T. 182).

5. It is apparent that the wound was caused by a .38 caliber bullet (approximately 9 millimeters) (N.T. 181; arithmetically .38 caliber seems to be 9.6 millimeters. Calibration is in the terms of inches and millimeters are simply the same thing expressed in the metric system).

6. The wound was not caused by the .22 caliber weapon of Smith. A .22 caliber bullet is 5.6 millimeters in diameter (N.T. 181, 182).

7. The .22 caliber revolver of Smith was not fired during the crime or outside the Market (N.T. 205).

8. The .45 caliber automatic of Hough was not fired during the crime or outside the Market (N.T. 198, 205) and its bullets were too big for the wound anyway (N.T. 182).

9. The .45 caliber revolver of relator was never recovered, or if it was recovered, it was never produced.

10. Only the relator had fired a shot inside the Market (N.T. 205).

11. The bullet fired inside the Market by relator had been recovered from the ceiling of the Market and it had been determined that it was .45 caliber (N.T. 190, 205, 257, 321).

12. It was not revealed until the trial of Smith, which followed relator's trial, that this bullet had been recovered and had been found to be .45 caliber. (Smith notes of testimony, relator's Exhibit No. 4, page 344; N.T. 265, 268).

13. Before and at the time of relator's trial the Assistant District Attorney knew of the existence of this bullet in the ceiling (N.T. 365, 401, 405). He knew the gun that fired it was a .45.

14. At the trial defense counsel asked the Assistant District Attorney if there were in existence bullets not in evidence. But the Assistant District Attorney did not inform them of any (N.T. 269).

15. The three uniformed police officers who fired their weapons outside the Market carried Smith and Wesson .38 caliber revolvers (N.T. 164, 180, 435).

16. The bloody .38 caliber bullet which is the subject of the following findings of fact was not mentioned at the magistrate's hearing, the Coroner's inquest, the Hough trial, or relator's trial.

17. During the trial of relator his counsel asked if the police had found any such bullet. Counsel received a negative response (N.T. 267).

18. Counsel tried everything they knew how. They did not know of the existence of the bloody bullet until it came to light at the subsequent trial of Smith (N.T. 285). This bullet had been found by detective Ahrndt within five minutes of the hold-up on the pavement ten feet east of the entrance of the Market "directly on a line where the body was laying" (N.T. 159, 160). It was about fifteen feet from the body (N.T. 161).

19. Detective Ahrndt took the bullet to Lieutenant Spangler, the Ballistic Expert of the Police Department (N.T. 173).

20. Due mostly to mutilation occurring after the bullet had struck whatever surface it did strike, Lieutenant Spangler was unable to determine precisely from what individual weapon it had been fired (N.T. 181). It was a lead bullet (N.T. 178), .38 caliber S. & W. Special such as carried by the police officers at that time (N.T. 164, 180, 435). It had been fired from a .38 caliber Smith and Wesson revolver (N. T. 237), not from a Colt (N.T. 223).

21. Lieutenant Spangler promptly took the bullet to Dr. Lampert, the Police Chemist, to determine whether or not what appeared to Spangler to be blood on the bullet was blood (N.T. 180). Dr. Lampert determined that it was blood (N.T. 208) and so stated to Lieutenant Spangler who then made a written report to that effect to the Superintendent of Police (N.T. 185, 208).

22. The names of Lieutenant Spangler and Dr. Lampert were omitted from the long list of witnesses whose names were listed by the District Attorney on the bill of indictment (N.T. 308, 329), thus depriving defense counsel of knowledge that Spangler and Lampert were witnesses. They did not testify.

23. No blood was found on relator's .45 caliber bullet which had been recovered from the ceiling of the Market or on pieces of relator's .45 caliber bullet which had been recovered from the facing of the Market (N.T. 321, 322). The latter bullet was not mentioned even at the Smith trial. The former, only at that trial.

24. The .38 caliber bullet which Detective Ahrndt found on the pavement is the only bloody bullet in the case.

25. Dr. Wadsworth and Mr. Del Torre, the present Ballistics Expert for the Police Department, examined the bloody .38 bullet on November 20, 1950. Mr. Del Torre's

notes made at the time indicate that the bullet had mushroomed (N.T. 245). Dr. Wadsworth testified that impact with the hard part of the skull would cause such a bullet to mushroom (N.T. 394).

26. From the very beginning Mr. Del Torre knew that the bullet was "a very vital exhibit" and so stated (N.T. 231).

27. The Assistant District Attorney who prosecuted Hough, relator and Smith knew all about the bloody bullet before the trial of relator, but deliberately and intentionally suppressed it.

(a) Captain Kelly told him about the bullet, how far from Ingling's head it had been found, and about the fact that it was bloody; the Assistant District Attorney stated to Captain Kelly that in his opinion it was immaterial because under the law all the defendants were responsible (N.T. 405, 406). This conversation took place before the trials (N.T. 401).

(b) Before Hough's trial (N.T. 369), which preceded relator's trial, Detective Morris heard the Assistant District Attorney tell the Captain that in his opinion the bullets were immaterial inasmuch as it was a hold-up (N.T. 365).

(c) At one of the trials, probably the Almeida trial (N.T. 334), Detective Coyne who prepared the case for the District Attorney (N.T. 328) held a conversation with the Assistant District Attorney in reference to the bullet and the Assistant District Attorney told Coyne he would not need the bullet "whether it came from a police officer's gun or one of the defendants" (N.T. 331).

(d) The District Attorney's office had the report of Detective Ahrndt with regard to the bullet (N.T. 163, 165).

28. When Lieutenant Spangler was about to make his only appearance in the course of the three trials under subpoena by the defense in the trial of Smith (eleven days after relator's trial) the Assistant District Attorney instructed him not to mention the blood on the bullet (N.T. 192). At that trial the Assistant District Attorney rested his case without calling Dr. Lampert, the Chemist, to the stand.

29. With regard to the contention that the evidence as to who fired the fatal shot was immaterial, the following findings are submitted:

(a) In the trial of Smith, Judge Milner charged the jury as follows: (See page 128 of Notes of Testimony before Welsh, J.; page 405 of relator's Exhibit No. 4, Smith notes of testimony:

"When fixing the penalty you take into consideration all the circumstances of the case, any mitigating circumstances, and all the facts of the case which you feel bear on the matter of what kind of punishment you should give this man. Was it a cool, unnecessary murder? Or are there some extenuating circumstances; Is it a fact that he shot or didn't shoot a man? And all those things enter into your consideration and should be considered by you in determining the penalty, bearing in mind this disputed part of the evidence, which you must first find, and that the doctrine of reasonable doubt, which I have talked to you about, does not apply in this matter of your fixing the penalty."

(b) The real issue of relator's trial was which penalty the jury should fix for first degree murder (N.T. 267).

(c) At the trial of relator the Assistant District Attorney in his speech to the jury proceeded on the theory that one of the hold-up men fired the fatal shot (N.T. 266).

(d) The Assistant District Attorney never said that Hough's testimony that relator shot Ingling was immaterial or that the testimony of the Ingling family that Smith shot Ingling was immaterial (N.T. 413, 414).

(e) At the trial of Smith when the evidence as to the bloody .38 caliber bullet and the .45 caliber bullet was offered, the Assistant District Attorney did not object that it was immaterial.

29. Relator has exhausted the remedies available in the Courts of Pennsylvania, including two certiorari petitions to the Supreme Court of the United States.

## Conclusions of Law.

1. The case is extraordinary. Ex parte Hawk, 321 U.S. 114, 118, 64 S.Ct. 448, 88 L.Ed. 572.

2. The circumstances were exceptional and the urgency peculiar when the jurisdiction of this Court attached. Darr v. Burford, 339 U.S. 200, 219, 70 S.Ct. 587, 94 L.Ed. 761.

3. The identity of the person who fired the fatal shot was a material question with regard to the penalty to be fixed for first degree murder.

4. It is the law of Pennsylvania that the jury must weigh all the circumstances of the case in fixing the penalty.

5. Under Pennsylvania law error as to evidence affecting the penalty may be reversible error.

6. The Assistant District Attorney deliberately and willfully suppressed at relator's trial material evidence which would have warranted the inference that a uniformed police officer fired the shot which killed Ingling.

7. This was fundamentally unfair and violated the due process clause of the Fourteenth Amendment of the Constitution of the United States.

8. Therefore the Court of Oyer and Terminer of Philadelphia County lost its jurisdiction to proceed to verdict, and judgment of sentence in the trial of relator.

9. The trial, verdict, conviction and judgment of sentence of relator as of Indictment No. 1282, March Sessions, 1947, Philadelphia County, are null and void.

10. Dr. Frederick S. Baldi, Superintendent of Philadelphia County Prison, Joseph C. Reing, United States Marshal, Eastern District of Pennsylvania, and J. W. Claudy, Warden of the Western State Penitentiary, Pennsylvania, have no valid warrant in law further to continue so much of the confinement of relator as is pursuant to the death sentence and they have no warrant to turn him over for electrocution or electrocute him pursuant to that judgment of sentence. This is without prejudice to whatever right may exist under the Constitution of the United States and under Pennsylvania law to try relator anew on Indictment No. 1282, March Sessions, 1947 charging murder. The question of that right, if it exists, is not before this Court.

11. Relator has exhausted the remedies available in the Courts of Pennsylvania, including two certiorari petitions to the Supreme Court of the United States.

The petition for a writ of habeas corpus is granted.