## UNITED STATES ex rel. ALMEIDA v. BALDI et al.

### No. 10478.

United States Court of Appeals Third Circuit.

Argued Dec. 6, 1951.

Decided March 27, 1952.

Randolph C. Ryder, Deputy Atty. Gen., of Pennsylvania (James W. Tracey, Jr., First Asst. Dist. Atty., Philadelphia, Pa., Robert E. Woodside, Atty. Gen., on the briefs), Colbert C. McClain, Asst. Dist. Atty., Philadelphia, Pa., for appellants.

Michael vonMoschzisker, Philadelphia, Pa., for appellee.

Before BIGGS, Chief Judge, and MARIS and GOODRICH, Circuit Judges.

BIGGS, Chief Judge.

The major question on this appeal is whether the deliberate suppression by the

Commonwealth of Pennsylvania of evidence vital to the defense in the trial of a capital case is such a violation of due process as to vitiate those proceedings.

 Almeida, with two companions, Hough and Smith, all armed, robbed a supermarket in Philadelphia. A shooting affray occurred and an off-duty policeman, Ingling, was killed. At Almeida's trial the Commonwealth produced evidence tending to show that he had fired the fatal shot. Almeida attempted to show by cross-examination (he did not take the stand), that Ingling was killed by someone else, possibly a member of the police force. The trial judge charged the jury, correctly according to the law of Pennsylvania, Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183,[1] that it made no difference whether Almeida, one of his companions, or even the widow of the dead policeman fired the shot, the offense nonetheless would be murder in the first degree if the killing occurred during the course of the robbery. The trial court also correctly charged the jury in accordance with Section 701 of the Act of June 24, 1939, P.L. 872,[2] that, if they found Almeida guilty of first degree murder, they should then fix the penalty at life imprisonment or death. The jury found Almeida guilty of first degree murder and fixed the penalty at death.

There is no doubt that the police were armed with .38 caliber Smith and Wesson revolvers. From the evidence at Almeida's trial it appears that Smith was armed with a .22 caliber revolver, Hough with a .45 and Almeida "with a large pistol".[3] It is

1. Cf. Commonwealth v. Moyer, 357 Pa. 181, 53 A.2d 736.

2. See Section 701, Act of June 24, 1939, P.L. 872, 18 P.S.Pa. § 4701, as follows:
 "*Murder of the first and second degree.* All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree. The jury before whom any person indicted for mur-

der shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether the person is guilty of murder of the first or second degree.
\* \* \*
"Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict. The court shall impose the sentence so fixed, as in other cases. \* \* \* "

3. See the opinion of the Court of Oyer and Terminer, Philadelphia County, on

also conceded that Almeida fired the only shot or shots which were fired within the supermarket.

At Almeida's trial, the Commonwealth put a number of bullets in evidence but not a .45 caliber bullet dug from between the roof and the ceiling of the market. This bullet proved that Almeida was armed with a .45. Within a few minutes after Ingling had been killed Ahrndt, a police detective, found on the pavement in front of the market and about a dozen feet back of the place where Ingling's body had lain, a .38 caliber bullet stained with blood. This bullet was not introduced in evidence.

Smith was tried eleven days after Almeida.[4] Smith's counsel, in a way not clear from the record, learned of the existence of the .38 caliber bullet and brought out many pertinent facts as to how Ingling had been killed.[5] This evidence showed that Almeida was armed with a .45 caliber "horse" pistol, Hough with a .45 caliber automatic revolver, and Smith with a .22; that Hough's .45 caliber automatic and Smith's .22 were recovered by the police while Almeida's .45 caliber revolver was not recovered; that Almeida was the only one of the robbers who fired inside the market and that a .45 caliber bullet was found between the wall and the ceiling of the market. The evidence at Smith's trial showed also that all the police officers (save perhaps Ingling, who was off duty) were armed with .38 caliber Smith and Wesson revolvers; that the .38 caliber bullet found on the pavement in front of the market and back of the place where Ingling's body had lain would fit the police revolvers; that a

.45 caliber bullet is 11.4 millimeters in diameter and that the diameter of the entering wound on Ingling's head was 10 millimeters as measured by the Coroner's physician; that a .38 caliber bullet is 9.6 millimeters in diameter and would fit the entering wound in Ingling's head almost perfectly and that while a bullet from Smith's .22 would have gone through the hole Smith's weapon had not been fired. The evidence further disclosed, as we have stated, that the .38 caliber bullet found on the pavement was bloodstained, and that Detective Harry Morris of the Philadelphia Police Homicide Squad had taken a written statement from Officer Mark McGinley that he had fired a shot outside the market and that a man had fallen to the ground; that no other man fell.

Some of the foregoing evidence, particularly that relating to the finding of the .38 caliber bullet, was brought to the attention of the Court of Oyer and Terminer by a paper entitled "Additional Reasons" for a new trial filed by Almeida. The Court noted this evidence as one of the reasons asserted for a new trial and denied the motion but we are not certain that the Court made any direct reference to the evidence. If it did, the reference is set out below.[6] At any rate the issue of deliberate suppression of evidence by the Commonwealth was not before the Court.[7] Counsel then appealed and also filed a petition for a new trial to the Supreme Court of Pennsylvania under Section 1 of the Act of April 22, 1903,[8] setting out, *inter alia*, the bullet evidence from the Smith trial. The petition was denied, Commonwealth v. Almeida, 362

---

Almeida's motion for a new trial, 66 Pa. Dist. & Co. R. 351, 353. "Hough said it [Almeida's pistol] looked like a horse pistol." "The pistol alleged to have been in the hands of Almeida was not recovered". 66 Pa. Dist. & Co. R. at pages 353 and 354.

4. Hough had pleaded guilty prior to Almeida's trial and was sentenced to death. He testified at Almeida's trial that Almeida had killed Ingling.

5. The jury fixed Smith's penalty at life imprisonment.

6. The Court said, 66 Pa. Dist. & Co. R. at

page 359: "He [Almeida] does, it is true, by a nimble exercise of ingenuity in the drawing of inferences from the record, seek to show that the fatal bullet came from a policeman's gun and not from a weapon in the hands of himself or one of his confederates."

7. In their reasons for a new trial Almeida's counsel said only that, "The District Attorney failed to inform counsel that these bullets [sic] were available and that the same would be available to the defense despite the fact that he would not use this evidence at the trial."

8. P.L. 245, 19 P.S.Pa. § 861.

Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183. But again the question of suppression of evidence was not directly raised,[9] and, as we will show later, the ambit of the statute is a narrow one. The Supreme Court of Pennsylvania denied the petition and affirmed the judgment of conviction. Again we are not certain whether the Court passed on the questions raised by the evidence relating to the .38 caliber bullet. The only reference in the opinion of Mr. Chief Justice Maxey conceivably pertinent to the new evidence is set out below[10] and certainly we cannot presume that the Supreme Court of Pennsylvania through its Chief Justice would so obliquely dispose of the issue of deliberately suppressed evidence vital to the defense. Application for certiorari was made to the Supreme Court of the United States and was denied, 339 U.S. 924, 70 S.Ct. 614, 94 L.Ed. 1346. Rehearing was denied, 339 U.S. 950, 70 S.Ct. 798, 94 L.Ed. 1364.

Almeida then filed a petition for a writ of habeas corpus to the Supreme Court of Pennsylvania which set up in detail the evidence secured at Smith's trial and to which we have referred in the second preceding paragraph. The issue of intentional suppression of pertinent and vital evidence was explicitly raised by the petition. Habeas corpus was denied by the Supreme Court of Pennsylvania in a *per curiam* opinion and order, no reasons for the denial being stated.[11] Application for certiorari was then made to the Supreme Court of the United States and was denied. See 340 U.S. 867, 71 S.Ct. 83, 95 L.Ed. 633.

The petition for habeas corpus was then filed in the court below. A very full hearing was had and a good deal of evidence was received. Much of it paralleled that taken at the Smith trial in the Court of Oyer and Terminer. Some of the evidence was new on the issue of suppression. For example, see the testimony of Detective Ahrndt. Ahrndt stated: 'In our reports, that [.38 caliber] bullet was there all the time—in my report about me finding the bullet and taking it to the chemical laboratory where it remained until the day of each trial, when it was brought down and taken back immediately after the trial." Ahrndt testified that Captain Kelly, who was in charge of the preparation of the case against Almeida, knew of the existence of the bullet and that he, Ahrndt, had taken it to Lieutenant Spangler, the Chief of the Ballistics Bureau of the Philadelphia Police, and that Assistant District Attorney Lipschutz had told him that the bullet "made no difference".[12]

Lieutenant Spangler[13] testified that prior to his taking the stand at the Smith trial, Mr. Lipschutz asked him not to mention the blood on the .38 caliber bullet: "He [Lipschutz] said, when you go to testify * * * [to] give a description of the particular bullet, * * * I don't wish you to mention the blood on the particular bullet * * *." Spangler testified that he replied: "* * * I am not able to do that, especially if I am asked about blood, I got to, because it is on my report." [14]

Mr. A. M. Adams, one of Almeida's counsel at the trial testified that Mr. Lipschutz was asked at the trial whether there were other bullets than those in evidence; that Mr. Lipschutz did not say "No" but did not inform him or his co-counsel of any

---

9. In their petition Almeida's counsel stated *inter alia:* "None of this evidence was available to counsel for the petitioner either before or at the trial. It could not have been, at least not without the help of the prosecution. * * * As a matter of fact, counsel for appellant [the petitioner] inquired several times during the course of the Almeida trial as to whether bullets had been recovered. None were offered to the appellant."

10. "In behalf of Almeida his counsel cite certain facts which they contend 'raise

the very strong inference that the fatal shot was fired mistakenly by a policeman.' " [362 Pa. 596, 68 A.2d 598.]

11. See 361 Misc. Docket, No. 9, Supreme Court of Pennsylvania, May 26, 1950.

12. See transcript before the court below, pp. 165 to 178 inclusive.

13. Lieutenant Spangler had retired prior to the hearing in the court below.

14. See id. at p. 192.

other bullet.[15] It should be noted also that neither the name of Lieutenant Spangler, the ballistics expert, nor of Dr. W. S. Lampert, in charge of the police laboratory, were listed on the indictment. Detective Ahrndt's name was so listed but, as we have indicated, he was not called as a witness at Almeida's trial. It should be observed also that Detective McGurk testified that he had filed a report with his superior as to finding the .45 caliber bullet between the wall and the ceiling of the market and that Lieutenant Del Torre, Lieutenant Spangler's assistant at the time of the trial, testified that he knew that the .38 caliber bullet was "a very vital exhibit".

In charging the jury at Almeida's trial, Judge Carroll stated: "The District Attorney introduced some thirty or thirty-one witnesses. The District Attorney has the obligation, no matter if it seems to be repetition, to call every witness who knows anything about it, whether that witness favors the Commonwealth's case or is against it, and in the fullest discharge of his duty, Mr. Lipschutz called, I assume, apparently all the witnesses that he could find." [16] Even while this statement was being made the law of the case by the trial judge, the Assistant District Attorney knew, if credible witnesses are to be believed, that evidence, which would have demonstrated conclusively that a bullet from Almeida's pistol did not kill Ingling, had reposed in a policeman's pocket throughout the trial. In Commonwealth v. Palermo, 368 Pa. 28, 33, 81 A.2d 540, 542, the Supreme Court of Pennsylvania said by Mr. Justice Ladner: "It is a settled principle of law that the Commonwealth must try a case fairly and that the district attorney is not a 'vindictive seeker for vengeance'. Commonwealth v. Karamarkovic, 1907, 218 Pa. 405, 408, 67 A. 650, 651." While the Court went on to say that the District Attorney must be permitted a wide discretion in determining what witnesses he will call to prove his case, nonetheless that discretion is to be exercised "under the general supervision of the trial judge."

Here, the trial judge was not permitted to exercise his discretion. In his concurring opinion in Commonwealth v. Neill, 362 Pa. 507, 520, 67 A.2d 276, 282, Mr. Chief Justice Maxey said: "Of course, if he [the District Attorney] should discover some fact which would militate in the defendant's favor it would be his moral and legal duty to bring this to the jury's attention * * *." See also Commonwealth v. Sarkis, 164 Pa. Super. 194, 199, 63 A.2d 360, 363, citing inter alia, Donaldson v. Commonwealth, 95 Pa. 21. We think that this decision of the Supreme Court of Pennsylvania represented the law of Pennsylvania in respect to this matter, at least until its ruling on the Almeida petition for habeas corpus.

The court below found that Almeida had been overreached and that he had been denied due process of law as guaranteed to him by the Fourteenth Amendment. It issued the writ of habeas corpus. 104 F.Supp. 321. The trial judge reached the specific conclusion that evidence tending to show that Almeida did not fire the fatal shot and that that shot was fired by a policeman was deliberately suppressed by the Commonwealth.[17] There is ample evidence in the record to support the findings and conclusions of the District Judge. Who killed Ingling was a relevant issue, as to penalty to be imposed by the jury at the trial, perhaps the most relevant one. Under the Act of June 24, 1939, the jury had the power of life or death over Almeida. In the court below as in this court the Commonwealth contended that the question of who fired the fatal shot was irrelevant to the issue of whether Almeida was or was not guilty of first degree murder, citing the decisions of the Supreme Court of Pennsylvania in Almeida's case and in the Moyer case. With this we agree. But the Commonwealth has never given any answer as to why the evidence to which we have referred, suppressed as the court below found it to have been, was not pertinent as to the issue of the penalty to be imposed by the jury on Almeida. Putting it bluntly, there is no answer for it is obvious that in weigh-

15. See id. at p. 269.

16. See Record on Appeal to Supreme Court of Pennsylvania, Vol. II, p. 344a.

17. See "Conclusion of Law", No. 6, in reality a finding of fact, and "Findings of Fact", 20 to 26, inclusive.

ing penalty the jury would have to consider whether Almeida intended to kill Ingling.

There could be no avoidance of this issue and there was none. This is why the Commonwealth endeavored to prove that Almeida or one of his confederates shot Ingling and why Almeida's counsel tried to show that Ingling came to his death by a bullet fired by a member of the police force. Much of the trial judge's charge was directed to this specific point and to the imposition of a penalty by the jury. The jury might not have been impressed by the suppressed evidence and could still have imposed the death penalty on Almeida but it cannot be assumed that the jury would have done so.

If the suppressed evidence had been offered and had been excluded by the trial court, it would have been reversible error for the suppressed evidence would have tended to show how the murder was committed, any question of penalty quite aside. While we can cite no Pennsylvania decision specifically on this point nonetheless the ruling of the Supreme Court of Pennsylvania in Commonwealth v. Chambers, 367 Pa. 159, 79 A.2d 201, is persuasive. In that case it was held to be reversible error to charge the jury in a capital case in such a manner as to discredit a defense that a possible accomplice and not the defendant had killed the victim and that evidence as to who committed the brutal beating which caused the killing was vital on the question of the penalty to be imposed by the jury. Mr. Justice Bell said, 367 Pa. at page 163, 79 A.2d at page 203, "Defendant contends that the veracity of his story about Phillips was of very great importance to him because if the jury believed defendant was only a look-out and that the brutal beating had been committed by Bryant and Phillips and not by him, the sentence might have been life imprisonment instead of death. With this contention we agree. In the light of this we shall examine the court's charge to which the defendant objects."

In Commonwealth v. Simmons, 361 Pa. 391, 401, 65 A.2d 353, 358, the Court ruled that records of prior convictions of the de-

fendant in a capital case were admissible "in order to aid the jury in its function of fixing the penalty if they found the crime to be one of murder in the first degree * * *." See also Commonwealth v. Stabinsky, 313 Pa. 231, 237–239, 169 A. 439, 441–442, and Commonwealth v. Wooding, 355 Pa. 555, 559, 50 A.2d 328, 329–330. We think that the law of Pennsylvania required the suppressed evidence to go to the jury if Almeida was to have a fair trial.

■ While excluding this evidence, if it had been offered, would have been reversible error, we are of the opinion that the suppression of it, uncorrectable on appeal since it was not in the record, did cause the Commonwealth to overreach Almeida and to deprive him of due process of law. In Bute v. People of State of Illinois, 333 U.S. 640, 649, 68 S.Ct. 763, 768, 92 L.Ed. 986, Mr. Justice Burton said that due process under the Fourteenth Amendment " * * * has reference rather to a standard of process that may cover many varieties of processes that are expressive of differing combinations of historical or modern, local or other judicial standards, provided that they do not conflict with the 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions * * *.'" We think that the conduct of the Commonwealth as outlined in the instant case is in conflict with our fundamental principles of liberty and justice. The suppression of evidence favorable to Almeida was a denial of due process. In Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 178, 87 L.Ed. 214, the Supreme Court of the United States said that allegations of "perjured testimony, knowingly used by the State authorities to obtain [a] conviction, and * * * the deliberate suppression by those same authorities of evidence favorable to [a defendant] * * * sufficiently charge a deprivation of rights guaranteed by the Federal Constitution, and, if proven, would entitle [him] to release from his present custody. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791." [18] The decision cited is

---

18. Compare decisions in which the use of known perjured testimony has been em-
ployed by the prosecution. White v. Ragen, 324 U.S. 760, 764, 65 S.Ct. 978, 89

the controlling authority. It has been such for seventeen years.

■■ Has Almeida exhausted his State remedies so as to bring himself within the purview of Section 2254 of Title 28, US C?[19] Almeida raised the issue of the newly discovered evidence in his motion for a new trial before the Court of Oyer and Terminer as we have said. It must be borne in mind that in Pennsylvania there is no discovery in a criminal case and we are of the opinion that his counsel cannot be justly accused of lack of due diligence in failing to find sources of evidence and evidence so well concealed. But his counsel did not raise the issue of deliberate suppression, perhaps because at the time they filed their "Additional Reasons" for a new trial they were not aware of the extent of the suppression. The testimony of Mr. Adams, of counsel for Almeida, given before the court below, tends to bear this out.[20] But in any event the evidence of the Smith case was not technically a part of the record in the Almeida case and this may explain why the Court of Oyer and Terminer in effect disregarded the evidence on which we have laid so much emphasis. In his petition for a new trial to the Supreme Court, though

deliberate suppression of evidence again was hinted at, it was not expressly alleged. But even if deliberate suppression of evidence had been alleged the Supreme Court of Pennsylvania by the very terms of the Act of April 22, 1903,[21] 19 P.S.Pa. § 861, could not have granted a new trial for under all the evidence, old and new, there can be no doubt that Almeida was guilty of murder in the first degree under the decision of the Supreme Court of Pennsylvania in Almeida's appeal, supra, interpreting its decision in the Moyer case. There is no question, however, that the issue of fundamental fairness was raised by Almeida's petition for habeas corpus in the Supreme Court of Pennsylvania as in that filed in the court below. That issue was, and remains, one of due process.

The meaning of Section 2254, Title 28, U.S.C., should be plain. It provides that a United States court shall not intervene by granting habeas corpus, assuming due process of law to have been denied by a State tribunal, unless the petitioner has exhausted all available State remedies; or there is an absence of a State remedy or circumstances are such that an existing State remedy would be ineffective. The

L.Ed. 1348; Hysler v. Florida, 315 U.S. 411, 413, 316 U.S. 642, 62 S.Ct. 688, 86 L.Ed. 932; Jones v. Kentucky, 6 Cir., 97 F.2d 335, 338; Soulia v. O'Brien, D.C. Mass., 94 F.Supp. 764, and United States ex rel Montgomery v. Ragen, D.C.Ill., 86 F.Supp. 382.

19. Section 2254 of 28 U.S.C. provides that, "An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

The Reviser's Notes, 28 U.S.C., state in pertinent part, "This new section is de-

claratory of existing law as affirmed by the Supreme Court. See Ex parte Hawk, 1944, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572." The Notes are to be regarded as authoritative in interpreting the meaning of the Code. United States v. National City Lines, 337 U.S. 78, 81, 69 S.Ct. 955, 93 L.Ed. 1226.

20. See transcript of proceedings in the court below, pp. 262–285, inclusive.

21. The Act provides: "Whenever by petition, supported by after discovered evidence, it shall be made to appear to the supreme court that there is ground for substantial doubt as to the guilt of any prisoner convicted of murder of the first degree, the said court shall have power to authorize the court of oyer and terminer in which such prisoner has been convicted to grant a rule for new trial, nunc pro tunc, notwithstanding the expiration of term in which such prisoner was convicted and sentenced; and thereupon the said court of oyer and terminer may, in its discretion, grant and proceed to hear such rule, as in other cases."

two disjunctive clauses on their face, at least, do not limit or modify the clause preceding them. The statute was intended to put into express language the holding of Ex parte Hawk, 321 U.S. 114, 118, 64 S.Ct. 448, 450, 88 L.Ed. 572. But that ruling is as explicit as any statute: "But where resort to state court remedies has failed to afford a *full and fair* [22] adjudication of the federal contentions * * *, or because in the particular case the remedy afforded by state law proves in practice unavailable or seriously inadequate * * * a federal court should entertain [the] petition for habeas corpus, else [the accused] would be remediless", citing Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, and Ex parte Davis, 318 U.S. 412, 63 S.Ct. 679, 87 L.Ed. 868.[23]

▮ Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761, holds that an application to the Supreme Court of the United States for certiorari is an essential part of the State remedy. But in the Darr case the Supreme Court did not repudiate the holding of United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361, that the denial of the writ of certiorari " * * * imports no expression of opinion upon the merits of the case". In its decision denying Almeida habeas corpus, the Supreme Court of Pennsylvania, per curiam, stated only that " * * * the matters complained of by the Relator do not warrant the granting of a Writ of Habeas Corpus. Writ refused." The denial was not qualified by the words "without prejudice". We cannot determine with absolute certainty the reason for the refusal of the writ. Our difficulty in determining why the Supreme Court of Pennsylvania refused the writ is enhanced because the Court took no testimony and made no findings. Under

such circumstances the allegations of the petition that vital evidence "was wilfully concealed" [24] must be taken to be true since no hearing was had. See Williams v. Kaiser, 323 U.S. 471, 474, 65 S.Ct. 363, 89 L.Ed. 398.

We cannot assume that the Supreme Court of Pennsylvania was ignorant of the law as laid down by the Supreme Court of the United States in Pyle v. Kansas and Mooney v. Holohan, supra, nor of the tenor of the decisions cited in note 18 to this opinion. But it is crystal clear, whatever may be deemed to be the effect of Darr v. Burford, that the Supreme Court of the United States on application for certiorari could not have determined the merits of the federal question presented by Almeida's application for it had before it no findings made by the Supreme Court of Pennsylvania. It is equally certain that the Supreme Court of Pennsylvania could not have passed upon the merits of the federal question presented by the petition for that Court received no evidence and made no findings as we have said.[25]

It may be argued, of course, that the Supreme Court of Pennsylvania, while assuming the truth of the allegations of the petition, nonetheless considered them to be legally insufficient. But, as we have already indicated, this would be an improper assumption for it is well settled that a court of the United States is not at liberty " * * to presume that the decision of the state court would be otherwise than is required by the fundamental law of the land, or that it would disregard the settled principles of constitutional law announced by * * * [the Supreme Court of the United States], upon which is clearly conferred the power to decide ultimately and finally all cases arising under the constitution and laws of

---

22. Emphasis added.

23. In the Moore case the Supreme Court of Arkansas had held that the Chancellor of that State was without jurisdiction to issue a writ of habeas corpus.

In the Davis case the Supreme Court of the United States denied leave to file a petition for habeas corpus because the applicant had not exhausted his State remedies.

24. See paragraph 9 of the petition.

25. It appears from allegations of the supplemental petition for habeas corpus filed in the court below, and admitted by the respondents, that a rule to show cause issued on the original petition returnable on May 26, 1950 at 10 A.M. The order denying the writ was handed down the same day. No evidence was received. No findings were made and no opinion handed down save that which we have referred to above.

the United States." See Ex parte Royall, 117 U.S. 241, 252, 6 S.Ct. 734, 740, 29 L.Ed. 868, and Bute v. Illinois, supra, 333 U.S. 640, 671–672, 68 S.Ct. 763, 92 L.Ed. 986.

The explanation as to why the Supreme Court of Pennsylvania dismissed Almeida's petition for habeas corpus is, we think, a comparatively simple one. It is suggested by the decision of the Supreme Court of Pennsylvania in Commonwealth ex rel. Paylor v. Claudy, 366 Pa. 282, 286–287, 77 A.2d 350, 352–353, where that Court made it plain that the granting of habeas corpus by it as a matter of original jurisdiction under Section 3 of Article 5 of the Constitution of the Commonwealth of Pennsylvania, P.S.Pa., is discretionary with the Court.[26] It follows therefore, and we think the conclusion is almost irresistible, that the Supreme Court of Pennsylvania denied the writ in the exercise of its discretion and did not pass upon the merits of Almeida's application. This conclusion is strengthened by the fact that the Court did not add the words "without prejudice" to the order "Writ refused" as it did in the Claudy case. Denial of Almeida's application therefore did not embrace an adjudication of the federal question by the Supreme Court of Pennsylvania and a fortiori did not involve adjudication on the merits by the Supreme Court of the United States.

■ Other questions remain for our determination. The first is: Has Almeida exhausted his State remedies in view of the language employed by the Supreme Court of Pennsylvania in the Claudy case which suggests that other Pennsylvania Courts may grant habeas corpus? In other words: Does Almeida still have an effective remedy in the Pennsylvania State Courts? The Supreme Court of Pennsylvania in the Claudy case said that the Court of General Quarter Sessions of Philadelphia has concurrent jurisdiction with it to issue the writ, citing the Act of April 4,

---

26. In the cited case Mr. Justice Stearne stated, 366 Pa. at pages 286–287, 77 A.2d 352–353: "While under Sec. 3 of Art. 5 of the State Constitution *original* jurisdiction is conferred upon the Supreme Court in *habeas corpus*, original jurisdiction is *also* conferred 'in cases of injunction where a corporation is a party defendant', of 'mandamus to courts of inferior jurisdiction' and 'of quo warranto as to all officers of the Commonwealth whose jurisdiction extends over the State.' In applications to this Court to take original jurisdiction in cases of injunction, mandamus and quo warranto, permission to so proceed lies within the discretion of the court and then only where the necessity for such action is apparent. M. D. Clark v. Borough of Washington, 145 Pa. 566, 23 A. 333; Wentz v. Philadelphia, 301 Pa. 261, 151 A. 883; Philadelphia Gas Works Co. v. Philadelphia, 331 Pa. 321, 1 A.2d 156. No reason exists why application to take original jurisdiction in cases of *habeas corpus* should receive different consideration than the other stipulated cases where the Constitution conferred original jurisdiction upon the Supreme Court. In Commonwealth v. Curry, 285 Pa. 289, 132 A. 370, Chief Justice Moschzisker said, 285 Pa. at page 291, 132 A. at page 371: 'While we have original jurisdiction in such matters, ordinarily applications for habeas corpus should go to other courts, having like jurisdiction, thus affording the Supreme Court time to perform its primary duty of reviewing the decisions of subordinate tribunals * * *.'

"We quoted this language with approval in Commonwealth ex rel. Shearston v. Keeper of County Prison, 295 Pa. 252, 253, 145 A. 130.

"In the current avalanche of petitions to this Court for writs of *habeas corpus*, with increasing frequency questions of fact are being submitted which require taking of testimony and exhibition of court and prison records. Cf. Commonwealth ex rel. Milewski v. Ashe, Warden, 362 Pa. 48, 66 A.2d 281.

"Should there exist imperative necessity or apparent reason why expedition is desirable or required, this Court in its discretion, may grant permission to proceed by original jurisdiction in *habeas corpus* applications, as in other cases under Art. 5, Sec. 3 of the Constitution, supra. In the absence of such necessity or desirability, the interests of the relator and the Commonwealth will be best served in this and similar cases by relator making application to the appropriate court where, with proper petitions, answers and evidence (when indicated), that court will, when required, make necessary findings of fact and conclusions of law, and enter such orders and decrees as it may deem appropriate. Appeal may then be had to either of the appellate courts."

1837.[27] But, as we have said, the refusal of the writ by the Supreme Court of Pennsylvania in the instant case, unlike its denial in the Claudy decision, was not qualified by the phrase "without prejudice". In Pennsylvania, as elsewhere, this phrase ordinarily is employed to indicate that the "judicial act done is not intended to be res judicata of the merits of the controversey." Fiumara v. American Surety Co., 346 Pa. 584, 593, 31 A.2d 283, 287, 149 A.L.R. 545; Media-69th St. Tr. Co.'s Tr. Mtge. Pool Case (In re Bell), 344 Pa. 223, 236, 25 A.2d 344, 350. Conversely if the phrase be not used to modify a judgment, the decision imports a final determination. So, in the instant case the decision by the Supreme Court of Pennsylvania refusing to grant Almeida's petition amounts to a rejection of the petition and a refusal to exercise judicial discretion. A refusal of habeas corpus is not res judicata but we are nonetheless of the opinion that no lower Pennsylvania Court could be reasonably expected, in view of the action of the Supreme Court of Pennsylvania and of the Supreme Court of the United States, to grant the writ to Almeida. The Superior Court of Pennsylvania in Commonwealth ex rel. Lewis v. Ashe, 142 Pa.Super. 357, 16 A.2d 433, has made this precise pronouncement under like circumstances.[28] We conclude, therefore, that Almeida has exhausted his remedies in the Courts of Pennsylvania, that there is an absence of available State corrective process, or that circumstances exist rendering such process ineffective to protect Almeida's rights. Where, as here, Almeida has exhausted his State remedies and has shown that he has been deprived of a federal right, he is not required to demonstrate that the case is one of exceptional circumstances of peculiar urgency.[29]

27. See P.L. 377, Section 2, 17 P.S.Pa. § 502.

This Act provides that the Court of General Quarter Sessions of the Peace of Philadelphia County shall have as full power and authority " * * * to allow and issue writs of habeas corpus as they now have as judges of the court of common pleas * * *." The power of the Court of Quarter Sessions like that of the Court of Common Pleas is based upon Section 1 of the Act of February 18, 1785. 2 Sm. L., 12 P.S.Pa. § 1871.

28. In the cited case the Superior Court said: "When a petition for writ of habeas corpus has been considered and refused by the Supreme Court of this Commonwealth, and a writ of certiorari to such order has been refused by the Supreme Court of the United States, this Court will not further review or consider the matters so passed upon and decided." The circumstances of the Lewis case seem to parallel precisely those before the court below and this court on this issue.

29. The court below originally had before it exceptional circumstances which in view of every practical consideration were those of peculiar urgency. These are set out in Almeida's brief, pp. 8–18, and may be briefly summarized as follows. On May 1, 1950 the Supreme Court of the United States denied the petition for rehearing of its denial of certiorari to review the order of the Supreme Court of Pennsylvania affirming the conviction in the main case of Commonwealth v. Almeida, 339 U.S. 950, 70 S.Ct. 798, 94 L.Ed. 1364. The Governor of Pennsylvania directed that Almeida's execution take place at 1:00 A.M. on Monday, May 29, 1950. On May 15, 1950 Almeida filed his petition for habeas corpus in the Supreme Court of Pennsylvania. As we have said, that Court issued a rule to show cause returnable Friday, May 26, 1950 and fixed that day for oral argument before it at Harrisburg. On May 19, 1950 counsel for Almeida wrote the Governor of Pennsylvania stating the steps that he had taken toward the procuring of a writ of habeas corpus and asked that the order of execution as fixed by the Governor be revoked or altered to the end that the merits of the petition for habeas corpus could be determined. This request was reiterated in another letter to the Governor dated May 25, 1950 written by Almeida's counsel. At 1:38 P.M. on Friday, May 26, 1950, the Supreme Court of Pennsylvania refused to issue a writ of habeas corpus and also denied any stay of execution. A few minutes later the Pennsylvania Pardon Board denied clemency. If the court below had not intervened with a stay order it is obvious that the case would have become moot and Almeida probably would have been executed be-

It is strenuously argued by the appellant that after the Supreme Court of the United States has had before it a petition for certiorari based upon a denial of habeas corpus by the Supreme Court of a State, a lower federal court is without power to intervene and grant the writ. This proposition is refuted by Darr v. Burford, supra, 339 U.S. at page 215, 70 S.Ct. at page 596, 94 L.Ed. 761, wherein it is stated: "Even after this Court has declined to review a state judgment denying relief, other federal courts have power to act on a new application".

In conclusion we state that we are not unmindful of the delicate balance which exists, and which must be preserved, between the Courts of the States and those of the National Government. Every conflict between these courts is by its very nature unseemly and must be avoided if possible. But the judges of the court below and this court, like those of the Commonwealth of Pennsylvania, have duties to perform. Every federal judge takes solemn oath to discharge those duties "agreeably to the Constitution and laws of the United States." In accordance with his oath Judge Welsh stayed Almeida's execution and granted him the writ of habeas corpus. We are similarly bound. The judgment of the court below will be affirmed.[30]

---

fore a stay could have been procured from the Supreme Court of the United States or a Justice thereof and a copy of the order served on Dr. Baldi. It may be doubted if Almeida's counsel could have procured a certified copy of the record from the Clerk of the Supreme Court of Pennsylvania, prepared a petition, taken it to Washington, secured the signature of a Justice of the Supreme Court and have served the stay order on Dr. Baldi before 1 A.M. on Monday, the 29th. In refusing the stay the Supreme Court of Pennsylvania rendered it practically impossible (absent intervention by a federal court) for Almeida to exhaust his State remedies. These facts sustain the qualification of extraordinary circumstances of peculiar urgency. Cf. United States ex rel. Auld v. Warden of New Jersey State Pen., 3 Cir., 187 F.2d 615, 618.

30. The grant of the writ will not keep Almeida from being tried again for he cannot successfully plead double jeopardy. See Commonwealth v. Townsend, 167 Pa.Super. 71, 76–77, 74 A.2d 746, 749; Commonwealth v. Gibbs, 167 Pa. Super. 79, 83–84, 74 A.2d 750, 753–754; Commonwealth ex rel. Townsend v. Burke, 361 Pa. 35, 41, 63 A.2d 77, 79–80, and Commonwealth ex rel. Wallace v. Burke, 169 Pa.Super. 633, 636, 84 A.2d 254, 255.