**UNITED STATES of America ex rel. John (Snooks) JACKSON, Relator,**

v.

**Alfred T. RUNDLE, Warden, State Correctional Institution, Philadelphia, Pennsylvania, Defendant.**

Misc. No. 2535.

United States District Court E. D. Pennsylvania.

July 24, 1963.

Howard Gittis, Philadelphia, Pa., for relator.

Frank Gilbert, Asst. Dist. Atty., James C. Crumlish, Dist. Atty., and John F. Hasset, Asst. Dist. Atty., for respondent.

WOOD, District Judge.

This is the relator's second application for a writ of habeas corpus brought in this Court. The first proceeding was before our late and learned colleague Judge Egan, on July 22, 1960,[1] wherein the petition was dismissed as being premature.

The record adduced at that hearing is hereby incorporated into this proceeding. Now the relator claims that his writ is timely for reasons more fully considered hereafter in this opinion.

In July, 1957, the relator was advised by a friend that a Philadelphia detective

---

1. Reported in United States ex rel. Jackson v. Banmiller, D.C., 187 F.Supp. 513.

named "Teddy" Jordan was looking for him. Pursuant to this advice he voluntarily appeared at Room 117 City Hall to see Jordan, whom the relator had known on a social basis. After his arrival, Jackson was questioned for approximately ten minutes by Jordan regarding his possible connection with a series of robberies then under investigation. Jackson told Jordan that he had received $3.00 from one Joseph Williams for the loan of his car. Jordan then assured the relator that he would not be implicated in the robberies if he would sign a statement admitting that he had received the $3.00. The relator agreed to make a statement and he was immediately presented with a prepared typewritten statement which he signed without reading. This confession in fact admitted the participation in three robberies which constituted the relator's three Bills of Indictment Nos. 1052, 1053 and 1091.

Judge Egan found, and we concur, that this confession was an obvious fabrication since in several instances the relator referred to *himself* as another participant:

"We each got 27.00 apiece, Julius Mercer, 'Snooks' Jackson, Williams and *myself*." (Bill of Indictment No. 1052)

"We went to the grocery store, *we* picked up Julius Mercer and 'Snooks' Jackson on the way. When we got to this store, Williams and I got out of the car and I took William's gun, walked into the store and told the man that it was a holdup. The man gave me $75.00. 'Snooks' Jackson and Julius Mercer were outside as lookouts in Mercer's car. When we got out of the store, we jumped into the car with Mercer driving and we went to South Philadelphia to a relative of Mercer's and we split the money up. *We* got about $18.00 a piece, Julius Mercer, 'Snooks' Jackson, Williams and myself. They then drove me back to West Philadelphia and dropped me off." (Em-

phasis supplied) (Bill of Indictment No. 1091)

After giving this statement, and following several preliminary hearings, the relator was incarcerated at Holmesburg Prison without bail until December 9, 1957. On that day, along with 12 to 13 other defendants, he was arraigned before the Court of Quarter Sessions for Philadelphia County and he pleaded "guilty" to Bills of Indictment Nos. 1052, 1053 and 1091. Among the persons arraigned that day were three different defendants with the same last name, namely, *Jackson*. There were over 40 indictments covering these 14 defendants who were represented by eight attorneys. There existed a great amount of activity and confusion as these defendants were being arraigned together.

The relator was represented by counsel who advised him to plead guilty to *all* the bills because of the statement which he had signed. This attorney failed to recognize the patent discrepancies contained in the statement to which we have referred.

Relator testified that the first time he learned that he had pleaded guilty to *robbery* was upon his return to Holmesburg, when a social worker advised him to that effect. He then contacted his attorney and told him that he wanted to withdraw his plea of "guilty" to these bills and plead "not guilty" instead.

On April 14, 1958, the relator appeared before the Court for sentencing. On pp. 267–278, inclusive, of the original record of the proceedings in the Court of Quarter Sessions, there may be found the colloquy between the trial judge, the relator, his attorney and the Assistant District Attorney. It is clear that the request for a change of plea on Bills Nos. 1053 and 1091 was summarily refused by the Court. (N.T. 267)

Relator's attorney did not attach any significance to the errors in the relator's confession, and it is doubtful if he ever noticed them. (N.T. 57 Habeas Corpus Hearing before Judge Egan.) Accordingly, his counsel advised him not to change his plea to Bill No. 1052. His

counsel testified at p. 275 of the original record that:

"If your Honor please, in the face of the statement shown to me by Mr. Williams (the purported confession of Jackson), that would be the basis of my advice to plead guilty. Since he says that that is not his statement, that he was not there, then I should think that his plea would have been not guilty."

Thus, had the relator been properly counseled, it is apparent that his withdrawal of plea would have run to Bill No. 1052 as well as the other charges. This statement was read to the Court along with another *ex parte* statement of a *co-defendant*, Joseph Williams, implicating Jackson. Williams testified on June 10, 1963, in a related proceeding, that at the time he allegedly made that confession he was mentally ill. It is undisputed that subsequent to the making of the confession Williams spent five years in a mental hospital and has just recently been released.

Compounding these errors were the material misstatements of the District Attorney to the Court regarding the *sworn* testimony of Williams, wherein the District Attorney stated that Williams named the relator as a participant in all *three* robberies. This testimony was given in the case of Commonwealth v. Spanks, and the *correct* reading of the record shows that Williams referred to a *Willie* Jackson and not the relator as a co-felon.

All of these mistakes were allowed without the interposition of any objection by the relator's counsel and without any effort to correct these obvious encroachments on the relator's rights.

Further confusion was engendered by the relator's statements to the Court admitting the one robbery. He contends now that all along he labored under the misapprehension that his receipt of the $3.00 from Joseph Williams made him a participant in the crime. Part of this misconception can be attributed to the relator's lack of education, having only completed six grades.

When the relator commented to the judge that he hadn't received a fair trial, he met with this reply:

"Treat you this way? How did you treat the shopkeepers?"

\* \* \*

"You want justice from us. Why didn't you do justice to the community?" (N.T. 275)

These remarks indicate the atmosphere of the proceeding and its truncated nature.

The relator then received *consecutive* sentences on all three bills totaling 20 to 40 years. No appeals were taken by the relator or his counsel from this sentence. Two petitions for habeas corpus were filed by the relator in the Court of Common Pleas of Philadelphia County. The first one was dismissed *without a hearing* and without an opinion. The second was dismissed *without a hearing* pursuant to an opinion which appears in Com. ex rel. Jackson v. Banmiller, 19 Pa.Dist. & Co. 2d 56. This decision was affirmed by the Superior Court of Pennsylvania, *per curiam*, Com. ex rel. Jackson v. Banmiller at 190 Pa.Super. 564. Both the Supreme Court of Pennsylvania and the Supreme Court of the United States have denied certiorari. Thereafter, relator filed a petition for habeas corpus in this Court which came on for hearing before Judge Egan.

On September 30, 1960, Judge Egan denied the relator's petition as premature. The Court said there had been no abuse of discretion by the Quarter Sessions Court in refusing to permit a change of plea as to Bill No. 1052 since relator's request specified only Bills Nos. 1053 and 1091 and relator was not yet serving the sentence imposed on the latter two bills, as to which the Court felt there had been an abuse of discretion.

As a result of this opinion, relator's court-appointed counsel, Alan J. Swotes, Esq., prepared an order reducing the relator's sentence and took this order to the trial judge for his consideration.

In the course of the delay before this order was signed and filed by the trial

judge, relator reinstituted habeas corpus proceedings in the Common Pleas courts. No action was taken upon the relator's petition until April 22, 1963, when he received a letter from the Prothonotary of the Common Pleas Court that the Court decided:

"And now, April 12, 1963: This matter is moot: The rule is discharged."

This order was signed by the same judge who sentenced the relator originally and he considered the matter as being moot because on *April 12, 1963* he filed an order *dated June 28, 1961*, amending his original sentence to make the relator's sentences run concurrently instead of consecutively, as previously imposed. This changed the relator's sentence from 20 to 40 years to 10 to 20 years.

■ Since the relator is now serving a combined sentence on all three bills, the petition is no longer premature.

■ It is apparent from the foregoing narrative that the relator's rights to a fair and complete hearing have been transgressed. Aside from his misconceived guilty plea, he has been convicted on a fraudulent confession, material misstatements of fact by the District Attorney, a confession of a mentally ill codefendant and the lack of effective representation by his own counsel.

Can it not be said that the sentencing judge was under a misapprehension as to the nature of Jackson's participation in the crimes?[2] At most, the defendant has consistently contended that his only *factual* link to this one robbery was his receipt of the $3.00 which he considered to be stolen goods because he unwittingly lent his car to Joseph Williams, a participant in the crime.

■ A plea of guilty does not strip the defendant of his rights to procedural due process. In United States v. Morin, 265 F.2d 241 (3 Cir. 1959), the Court said on p. 245:

"Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences. When one so pleads he may be held bound. * * * But, on timely application, the court will vacate a plea of guilty shown to have been unfairly obtained or given through ignorance, fear or inadvertance. Such an application does not involve any question of guilt or innocence."

The wheels of injustice began to roll over Jackson when he was inveigled into signing a false confession upon the promise of the detective that he was confessing only to receiving stolen goods and that if he signed he would not be involved with the robberies.

We find that the entire proceeding was so fraught with constitutional error that it is impossible to separate the due process deficiencies on each Bill of Indictment. The most elemental rights of due process were denied this prisoner and the safeguards of effective counsel and a fair prosecutor were distorted in such a way that the trial became a nightmare of injustice.

We recognize that on a guilty plea the relator was not entitled to have much said on his behalf but he was entitled to *not have material misstatements* read to the Court while his attorney stood mute. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1947).

The writ is granted. However, nothing that is said here precludes a new trial or the taking of proper steps to hold the defendant in custody pending such a new trial or an appeal to the Circuit.

2. United States ex rel. Mercer v. Commonwealth of Pennsylvania, 310 F.2d 25, 29 (3 Cir. 1962). Mercer was a co-defendant with Jackson and after remand by the Circuit Court his petition for habeas corpus was granted by the District Court on January 2, 1963, see M-2365. (transcript)

Court. United States of America ex rel. Butler v. Maroney, 319 F.2d 622 (3 Cir.).

Counsel for the relator, Mr. Howard Gittis, Esq., is commended for his unselfish service and excellent advocacy on behalf of the relator.