**UNITED STATES ex rel.**
**Edward J. HOUGH**

v.

**James F. MARONEY, Superintendent,**
**State Correctional Institution, Pitts-**
**burgh, Pennsylvania.**

**Civ. A. No. 62–893.**

United States District Court
W. D. Pennsylvania.

Oct. 29, 1965.

Marjorie Matson, Pittsburgh, Pa., for Edward J. Hough.

Burton Saltzburg and Arthur J. Merriman, Asst. Dist. Attys., for the Commonwealth.

ROSENBERG, District Judge.

This petition for the issuance of a writ of habeas corpus is now here because of the suppression of evidence of a fatal bullet by an Assistant District Attorney.

The petitioner, Edward J. Hough, here seeks to void a State court conviction on the charge of first degree murder. He is presently incarcerated in the State Correctional Institution at Pittsburgh, Pennsylvania. He avers in his petition that he pleaded guilty to a charge of murder while ignorant of the fact that a police bullet struck down the victim. He asserts that he would not have pleaded guilty if this evidence had not been suppressed and he had known that it was not one of the bullets of his co-robbers for which he believed he was chargeable with murder.

This petitioner's case and that of his two associates, David Almeida and James F. Smith, have received wide attention from both the State of Pennsylvania and Federal courts at various times. This is the first petition presented by Hough to a federal court.

Hough was first sentenced in the Court of Oyer and Terminer, Philadelphia County, at No. 1282 March Term 1947 and the death penalty was imposed. On February 24, 1955, after a long series of battles in the State courts and before the administrative and executive bodies in Pennsylvania, the death sentence was commuted to life imprisonment.

Upon the filing of this petition, I ordered the holding of a hearing at which the petitioner was present with his outstandingly competent counsel, Mrs. Marjorie Hanson Matson. The Commonwealth was represented by two Assistant District Attorneys, Burton Saltzburg, Esquire and Arthur J. Merriman, Esquire, of Philadelphia County.

At the hearing the petitioner's counsel was instructed to freely present the petitioner's case. The only witness was the petitioner himself. He testified in considerable detail of his having become associated with David Almeida and James Smith, and as to what occurred on that fateful day of January 30, 1947. He testified that at approximately 5:00 o'clock in the evening with a stolen car they moved diagonally to the curb and parked with Smith remaining in the driver's seat, in front of the Acme Supermarket at 20th and Fairmount Avenues in Philadelphia; that Hough and Almeida entered the supermarket with guns; that Hough scooped money out of the cash register; that when someone in the store "hollered" something about a holdup, a gun was fired; that Almeida fired several shots; that Almeida left the store first and when Hough came to the car, Almeida was already in it; that in the meantime an off-duty City patrolman named Ingling had come up in a car with his family to shop; that he had pulled his car alongside that of the holdup men; that when Hough came out of the store, police had already pulled up and there was some shooting going on; that it does not appear where Ingling was at the time, but Hough said that he had to

jump over the left front fender of Ingling's car in order to get into the getaway car; that Ingling's car had somehow gotten too close to the getaway car and the right hand door of the getaway car became sprung as an attempt was made to back it out; that the getaway car was a coupe in which Smith sat in the driver's seat, and when Hough got to it, Almeida was already in the middle seat; that Hough, in spite of the sprung door jumped into the right hand seat where he was able to hold on for about eight or ten city blocks; that when the getaway car made a left turn around a corner, Hough fell out and started to run away; that he was then caught by the police; that Almeida and Smith made their getaway and were not apprehended until about a year later; that Hough had been drinking before this occurred and at the time of his apprehension was half intoxicated; and that Officer Fox who caught him hit him on the head several times with his pistol and things were rather vague. He then related to the incidents after his arrest, of being taken from place to place and questioned, of his admitting his complicity in the crime of the holdup and of his being told on the first night, immediately after he was arrested, by one Captain Kelly that Ingling was dead. This conversation he related as follows: "Kelly said to me, he said, 'you know Ed you're not being held for robbery.' I said, 'Well, what am I being held for?' He said, 'Murder'." He testified that Officer Kelly and Officer Ahrndt had been questioning him about a .38 caliber gun and of the caliber of Almeida's gun, but that evidently the information he had given them was not what they desired. He was also told by Kelly about the confused statements of the Ingling family as to who had fired the shot which killed Ingling; however, he never knew and no one had ever told him that it was not the bullet of any one of the three holdup men that had struck down and killed Ingling. Even at the coroner's inquest, he said, Mrs. Ingling stated that the man who was riding in the middle fired the shot that killed her husband, and she identified him as Smith; but actually, Almeida was riding in the middle and Smith was driving. A month after his arrest he was taken for arraignment and pleaded not guilty. He was not then represented by counsel. In fact he did not have the benefit of counsel until approximately six or seven days before his trial when Attorney Louis McCabe was appointed by the Court to represent him. He said that he did not discuss the change of plea with his lawyer until the morning of the trial, when his lawyer advised him that he thought a guilty plea would be best. He said his lawyer told him he would go down and talk to Judge Oliver; that he was gone for some time and came back and said that he had talked to Judges Oliver, Crumlish and Cohen, who made no commitments as to what they would do; and that his attorney said "public opinion being what it is, I don't think you stand a chance before a jury, so my advice is to plead guilty before these men who will only consider facts and not emotion." The petitioner then followed his attorney's advice and pleaded guilty. Hough testified that when he did plead guilty, he, himself, believed it was Almeida who had fired the fatal shot. He said he believed this because in all the evidence he had heard at the preliminary hearing and at the coroner's inquest and from the conversations with the various detectives and Captain Kelly, it was so indicated. He testified that there was no evidence offered before his trial before the three judges which would lead him to believe that the fatal shot had not been fired from the gun of one of his co-felons. The three judges sentenced him to suffer the death penalty. Hough testified that it was not until a year or more later when, in the first week of June 1948, Almeida was tried for the crime and when two weeks later, Smith was tried that he subsequently heard "that there was a suppression of evidence that was brought out at Smith's trial, which in effect saved his life." He stated that he did not learn the details of this until 1951 after Almeida had presented his petition for habeas corpus to the United States District Court in Philadelphia.

Hough now asserts that he would not have entered a plea of guilty if he had known all the facts and particularly that which had been suppressed that a bullet from the gun of one of the police had killed Ingling. Does this assertion by the petitioner, under the circumstances, raise any Federal question which would entitle him to habeas corpus relief?

For a long period of time after the hearing I attempted to get from the District Attorney of Philadelphia County the records or copies of the records of the Hough proceedings before the coroner and the police. I did receive the printed paper book of the record in the Appeal from the Judgment and Sentence of the Court of Oyer and Terminer and General Jail Delivery of the County of Philadelphia by Hough to the Supreme Court of Pennsylvania, in which was set out the proceedings, the questions and answers and arguments before the three-judge court which pronounced the sentence of death after the plea of guilty to murder in the first degree. In addition to these, I have studied all the related court records as officially reported.

The record and the chronology of the related events here follow:

1947–Petitioner's plea of guilty heard by a three-judge court. This is set out in the record of appeal as presented to the Supreme Court of Pennsylvania.

1948–Appeal to the Supreme Court. The Supreme Court affirmed the decision of the three-judge court. Commonwealth v. Hough, 358 Pa. 247, 56 A.2d 84, 1948.

1955–Petitioner's death sentence was commuted to life imprisonment. Commonwealth ex rel. Hough v. Maroney, 402 Pa. 371, 373, 167 A.2d 303 (1961).

1959–At No. 3489 December Term 1959 in the Court of Common Pleas, No. 7 of Philadelphia County, the petitioner filed for the issuance of a writ of habeas corpus and coram nobis. His counsel in this present proceedings raised the legality of the decision of the three-judge court imposing a death penalty. It was argued at that time that if the victim was killed by a bullet fired from the gun of a police-man, that such constituted an incidental killing under which circumstances the petitioner's sentence under the conviction of murder would not be sustainable on the holding of the Supreme Court of Pennsylvania in Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472, 1958. Upon the refusal of the Common Pleas Court to grant the petition for habeas corpus and coram nobis, an appeal was made to the Supreme Court of Pennsylvania.

1961–In Commonwealth ex rel. Hough v. Maroney, supra, the question was presented to the State's high tribunal. The Supreme Court determined and stated at page 375 of 402 Pa., at page 306 of 167 A.2d: "Under the felony murder rule as it existed in this State at the time of the appellant's plea of guilty to a charge of murder generally, his conviction of murder in the first degree and his ensuing sentence to death, who fired the fatal shot was irrelevant to the guilt of the felonious conspirator so long as it was fired in aid of or in resistance to the perpetration of the felony." Certiorari was denied by the United States Supreme Court in Commonwealth ex rel. Hough v. Maroney, 366 U.S. 971, 81 S.Ct. 1936, 6 L.Ed.2d 1260, 1961.

It will be necessary now to advert to the factual history of the overall case. At the time the three robbers perpetrated the holdup of the Acme Supermarket, the petitioner was armed with a .45 caliber automatic gun. Smith was armed with a .22 caliber pistol and Almeida used a .45 caliber gun. A great deal of confusion occurred at the time of the holdup and while the robbers were withdrawing from the scene. Gun shots had started when the manager of the supermarket reached for two cans of corn to throw at the robbers. Almeida fired at the manager but missed. (Tr. pg. 24a) In the meantime, an off-duty police officer named Cecil Ingling had pulled up alongside the robbers' car and Ingling had gotten out onto the sidewalk. With the withdrawal of the robbers from the store, police had come on the scene and they brought their guns into action. Ingling

fell to the sidewalk after a bullet had struck him in the head. Throughout all this confusion there was no doubt that Ingling was shot and eventually died as a result of the gun fire. There was also confusion as to whether Hough fired his gun or not. At his trial, Officer Fox testified that Hough fired a shot at officer Andrew Waters, but the shot missed him (Tr. page 43a). Officer Waters also testified that Hough shot once at him but missed (Tr. pages 65a–66a). When Hough took the stand he denied that he ever fired a shot (Tr. page 87a). Lieutenant Kelly testified that Hough's gun had been fired recently, "within the past forty-eight hours." (Tr. pages 63a–64a). However, we have no indication as to what 48 hour period this refers.

In escaping Hough was quickly apprehended. Smith and Almeida escaped and were caught about a year later. After some weeks during which time Hough had had no attorney, he pleaded guilty to the charge of murder on the advice of his counsel who had been appointed just before his trial. After Almeida and Smith were caught, Almeida was tried first and found guilty by a jury of murder in the first degree with the recommendation for the death penalty. Commonwealth v. Almeida, 66 Pa.Dist. & Co. R. 351 (1948). Smith's trial followed two weeks later. This trial was not reported.

At Almeida's trial, Hough testified in favor of the Commonwealth and asserted that it was the bullet from Almeida's gun which had struck down the victim Ingling. This evidence remained unchallenged by the District Attorney who permitted it to go to the jury. This same evidence had been submitted a year earlier by Hough before the coroner.

In the Smith case, the jury found him guilty of murder in the first degree and recommended life sentence. No further proceedings appear as regards Smith. (402 Pa., at page 373, 167 A.2d 303)

On appeal, the Supreme Court of Pennsylvania affirmed the conviction and sentence of Almeida. Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183. Thereafter the Almeida case came to the attention of the Federal court when a petition was presented for a writ of habeas corpus to the United States District Court for the Eastern District of Pennsylvania in the case of United States ex rel. Almeida v. Baldi et al., 104 F.Supp. 321, 1951. Judge Welsh after an exhaustive opinion, made findings and provided for the issuance of a writ of habeas corpus. Our Court of Appeals for the Third Circuit affirmed Judge Welsh in United States ex rel. Almeida v. Baldi et al., 195 F.2d 815, 33 A.L.R.2d 1407, 1952.[1]

Since Judge Welsh so aptly detailed the circumstances upon which the present petitioner now stands and which I consider here pertinent, I adopt the following factual excerpts from his opinion, 104 F.Supp., pages 323–324:

"At the trial of Almeida the State produced a number of lead bullets and fragments of bullets. The Court and Jury were led to believe that all the evidence had been produced before them. But there was one bullet in the possession of the State that the State did not produce. It is upon this bullet that the entire case rests. We will state here that all the evidence produced before us came from the State's own witnesses."

\*　\*　\*　\*　\*　\*

"Officer Ahrndt testified that he hastily rushed to the scene of the crime and got there shortly afterwards and started to look for every bit of evidence. He found the bullets and fragments of bullets we have referred to above. But about 15 feet from where the head of the unfortunate Ingling was lying he found a bloody lead bullet of .38 caliber. It was not fragmentized but distorted in shape showing that it had come in contact with some hard substance. He carefully wrapped it up in a piece

1. On retrial before the State court Almeida pleaded guilty and was sentenced to life imprisonment.

of paper and took it to Officer Spangler at headquarters. Officer Spangler is the ballistic expert of the County of Philadelphia, Bureau of Police. Officer Spangler weighed the bullet, measured it, certified that it was of .38 caliber, and had the State chemist make an analysis of the stains on the bullet. The State chemist officially certified that the stains were blood-stains. The police made proper records of all that they did."

\* \* \* \* \* \*

"At the coroner's inquest this bloodstained bullet was not produced nor was any reference made to it in any manner. Neither the Coroner nor the Coroner's physician had any knowledge of it and the Coroner completed his autopsy completely ignorant of this important piece of evidence. The autopsy showed that the bullet that penetrated Officer Ingling's head was .38 in caliber. It was admitted that the police are armed with this type of gun, .38 in caliber and using a lead bullet.

When the District Attorney came to prepare the case for trial he sent for all the witnesses who were known to have any knowledge of the crime. The police called attention to their possession of this bloodstained bullet and the chemical analysis of the stains. The police were told by the District Attorney that it was not necessary for them to produce this at the trial. The police did not produce this at the trial. Counsel for the defendant had no knowledge of the existence of the bullet or its history. The record shows that the trial Judge at the trial did not have the matter of the bullet called to his attention by the District Attorney. Counsel for the defendant could not call for its production, having no knowledge of its existence, and the Court having no knowledge could not rule upon its admission or exclusion. Neither could the Appellate Court. The case went to trial on the evidence and

theory of the State that Almeida had fired the shot that killed Ingling and asked the jury to so find. The State produced Hough, the co-defendant. Hough at his own trial swore that he did not know who fired the fatal shot. At the trial of Almeida he testified that, he, Hough, was standing alongside of Almeida and that Almeida within two feet of Ingling fired the fatal bullet and stated 'I got the son of a bitch'. But the gun that Almeida had was of .45 caliber. The .45 caliber bullet Almeida fired into the ceiling of the super-market was not produced at the trial. Its production would have been persuasive with the Jury because it is admitted that Almeida fired the .45 caliber bullet into the ceiling. It was a steel jacketed bullet of .45 caliber and was produced before us and no explanation as to why it was suppressed at the trial. The hole in the head of Ingling was made by a .38 caliber bullet.

The existence of the bloodstained bullet was not discovered until the co-defendant Smith came to be tried. How counsel for defendant learned of this most important piece of evidence was not brought out. Right here we must call attention to a significant and sinister piece of testimony. At the trial of Smith, Almeida having been tried and condemned to death, counsel for Smith subpoenaed Officer Spangler and Officer Ahrndt who had personal and official knowledge of the bloody bullet. The District Attorney told Officer Spangler that if the defendant's lawyer called him to the stand he was not to say anything about the bloody bullet. The officer protested against such instructions and said he would not do anything of the kind; that he had made his report in writing, and that he had a chemical analysis of the bloodstains, and if he was asked he would state the facts. At the trial of Smith the defense subpoenaed these officers. The Assis-

tant District Attorney put Lieutenant Spangler on the stand but did not interrogate him about the bloody bullet. The defense then brought it out on cross examination of Lieutenant Spangler. Only after that did the Assistant District Attorney put Detective Ahrndt on the stand and ask him about the bullet."

The facts as detailed by Judge Welsh in the Almeida case apply in related fashion to Hough.

All three robbers are now serving life sentences, Almeida and Smith have raised no further questions and the problems of suppression of evidence no longer affects them. Hough is now here and in effect states that the willful action of the District Attorney has unconstitutionally deprived him of his right to a fair trial.

Was the question of a fair trial presented to the State courts and was it fairly determined? What appears to have been the thinking of the three-judge court which originally sentenced Hough? Judge Joseph L. Kun said this: (Page 108a, Appeal Record)

"Mr. McCabe, in my view of the case it is utterly immaterial who fired the shot. And I will go so far as to say that even if the proofs here were that your man, the defendant, did not have a gun, he would be equally guilty and subject to the death penalty; whereas in your case he admittedly had a gun, and he took a couple of pot shots against a policeman that he, fortunately for the policeman, missed. And so there is nothing in it at all of an extenuating nature, not the slightest."

This statement by one of the three-sentencing judges must be here accepted in the sense that it was spoken to a man who stood convicted before them, but with this difference—that the sentencing judges were supplying facts never before supplied to the convicting trier of the facts. That the defendant, himself, was the convicting trier of the facts is even more pertinent in the light of an accused's constitutional rights.

The thinking of the sentencing judges was approved by the Pennsylvania Supreme Court in Commonwealth v. Hough, supra. Mr. Justice Eagen in Commonwealth ex rel. Hough v. Maroney, supra, 402 Pa. at page 376, 167 A.2d at page 306 said this:

"While the fact as to who fired the fatal shot in the instant case may have been relevant to the question whether the appellant's guilt of murder in the first degree merited life imprisonment or the death penalty (United States ex rel. Almeida v. Baldi, supra), the death sentence which he originally received was later commuted to life imprisonment so that he has been accorded the most favorable sentence fitting the crime whereof he was duly found guilty. Obviously, therefore, the allegation that the fatal shot was not fired by one of the appellant's co-conspirators, even if established, cannot help him."

This reflected what had been the accepted rule of law as set out in Commonwealth v. Doris, 287 Pa. 547, 135 A. 313, 1926. It was expressed in these words:

"There can be no question of the legal responsibility of the accomplice for the act committed by his co-conspirators while the crime agreed upon is in the course of perpetration, for he is criminally liable for the natural consequences of the acts of his fellows, under such circumstances."

When Hough with his attorney, McCabe, came before the three-judge court and pleaded guilty, it was, in all likelihood, with the thinking that he stood to get the death penalty unless his life was spared by a plea of guilty and the fact that he said he had not used his gun. For certainly it is reasonable to believe that no man will plead guilty in order to get a death penalty, unless he is mentally or emotionally affected. Quite evidently the thinking of Hough as advised by his counsel was strengthened by Commonwealth v. Moyer, 357 Pa. 181, 53 A.2d 736, 1947. This had just been de-

termined, and re-enforced the Doris case.

From 1947 until 1955, Hough struggled for his life even though for one which would be caged within walls of stone and iron. But that is not the question; for our concern must be with the rights of a man under whatever circumstances. In 1958, the Redline case came for determination and the thinking of the Doris and Moyer cases changed; for questions were raised by members of the Supreme Court as it re-interpreted the so-called felony-murder doctrine, and as doubts were cast upon it by one of its members on the correctness of the decision in the Almeida case.

In Redline, a police officer killed one of two robbers. The second robber was then charged with murder on the theory that he had, as one of the two, set into action a course of conduct which resulted in the death of another person. In his opinion, Mr. Chief Justice Jones elaborately discussed the common law doctrine and its variables. A concurring opinion of Mr. Justice Cohen asserted that the majority opinion should have overruled Almeida on the theory that the homicide was neither the act of the defendant nor by the application of the co-conspirator's rule, by one acting in concert with him in furtherance of the conspiracy.

As it relates to Almeida, Mr. Justice Cohen said at page 511 of 391 Pa., at page 500 of 137 A.2d:

"When Almeida is weighed against the above requirements it is apparent that the decision cannot stand because the homicide therein was not committed 'by an act of the defendant or, by applying the co-conspirator's rule, by one acting in concert with him in furtherance of the conspiracy.'"

And he stated at page 512, 137 A.2d at page 500:

"In Almeida the defendant in attempting to escape from the scene of his robbery provoked a gun battle with police in which a third party was shot and killed by one of the pursuing officers. The policemen's act of shooting was excusable. That excusable shooting, however, cannot confer liability upon Almeida for the death of a third party. *'The killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.'* (Majority opinion [page 496] 137 A. 2d at page 476) 'In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing.'* Majority opinion [page 495] 137 A.2d 476 (emphasis in the original). Since Almeida himself did not commit the homicide, nor did anyone acting in concert with him so do, it follows that Almeida should not have been convicted of murder. See the numerous cases cited in Majority opinion [pages 486–510] 137 A.2d at pages 476 to 480."

In this connection, the problem of extenuating circumstances in Hough is even more delicate than it is in Almeida because Almeida fired a gun which possibly set off the chain of events resulting in Ingling's death; and while Hough stated he did not fire his gun, he was, under the circumstances, made answerable for what Almeida did.

I set these matters out, not because the doctrine of felony-murder as it may have existed or been applied in 1947 when Hough pleaded guilty was material in affecting the penalty which Hough had received, but rather, because of the question of whether or not the State courts had before them the true facts of the case and determined from these the validity of the basic judgment and because of the possibility there may have been a lack of fundamental application of due process as possible doubts were raised or suggested in the concurring opinion by Mr. Justice Cohen in the Redline case.

I am aware of the pervading answer to the petitioner's complaint—that since he is now serving a life sentence, as Mr.

Justice Eagen phrased it (Commonwealth ex rel. Hough v. Maroney, supra, 402 Pa. at page 376, 167 A.2d at page 306), "(sic) the death sentence which he originally received was later commuted to life imprisonment so that he had been accorded the most favorable sentence fitting the crime whereof he was duly found guilty."

That could have been the answer in 1947 when Hough pleaded guilty and was being sentenced—if the truth had then been presented to the sentencing judges. Because the actual facts were not divulged at that time but in their place certain false circumstances [2] and a suppression of truth at the critical time when Hough's criminal charge was being prosecuted, was the action of the prosecutor with full knowledge of what he was doing, in essense, a deprivation of the defendant's fundamental rights? And was, by this action of the prosecution, Mr. Justice Eagen not misled into saying that it was "the crime whereof he was *duly found guilty?*" (emphasis added) And as based upon this, was the proceeding of sentencing valid?

▇ This petition presently before me presents two questions. First, Did the petitioner have a fundamental right to know all of the facts surrounding the crimes in which he was involved and the charges which were made against him, in order that he might have knowingly and freely exercised his will in choosing to stand convicted of such charges without being proved guilty? The fact that he faced a penalty of death or life and that his choice may have been limited under any circumstances is not presently before me. These are State questions. Com. of Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 58 S.Ct. 59, 82 L.Ed. 43 (1938); United States ex rel. Hart v. Maroney, 230 F.Supp. 468 (D.C.1964). The question of mitigation of the punishment of Hough cannot be before me. I have no judicial obligation or inclination to consider these as federal questions.

I now have the facts of the case before me. The record is plain. The prosecution intentionally suppressed certain evidence and passively stood by and permitted certain false evidence to appear as truthful circumstances. These continued to exist prior to and at the time Hough was brought for trial and while he pleaded guilty, and even afterwards when he was making various attempts before the courts to get mitigation of his sentence for murder in the first degree.

I have examined all of the State reports carefully. In addition, I have attempted to get the paper books or briefs and copies of the pleadings filed by Hough before the Common Pleas Court of Philadelphia and before the Pennsylvania Supreme Court. Typewritten copies were supplied me by Hough's counsel.

There is no doubt whatsoever that the Pennsylvania courts knew of the fallacious and suppressed evidence and that they had based their determinations on this evidence. This is reflected in what Mr. Justice Eagen said at page 373 of 402 Pa., at page 304 of 167 A.2d (Commonwealth ex rel. Hough v. Maroney, supra);

2. Sentencing Hearing, Tr. page 15a, the daughter said "the man in the center (Almeida) pulled out a gun and shot Dad."

Tr. page 8a, son said "the other man in the car, James Smith, (driver) he shot Dad."

Tr. pages 65a–66a, Officer Waters testified in answer to the question "Did anybody shoot at you?"—"The defendant (Hough)".

Tr. page 87a, Hough in answering the question, "Did you fire a shot a Patrolman Waters or anybody else?", said "As God is my judge, I didn't fire a shot at anybody. I had both hands in my pockets."

Tr. pages 63a–64a, evidence is not clear on any ballistic test of Hough's gun. Lieutenant Kelly when asked "What did the gun show?" answered "Recent evidence of recent firing * * * As within the past forty-eight hours."

NOTE: The District Attorney remained passive to all this evidence without making any effort to clarify it—even as at the same time he suppressed the evidence of the fatal bullet.

"Subsequently, Almeida instituted a habeas corpus action in a federal court, alleging for the first time deliberate suppression of material evidence by the Commonwealth. The writ was granted: United States ex rel. Almeida v. Baldi, D.C. E.D.Pa.1951, 104 F.Supp. 321 affirmed, 3 Cir., 1951, 195 F.2d 815, 33 A.L.R.2d 1407, certiorari denied 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341, rehearing denied 345 U.S. 946, 73 S.Ct. 828, 97 L.Ed. 1371. The circuit court of appeals stated that, although the question as to who fired the fatal shot was irrelevant to the issue of whether Almeida was or was not guilty of first degree murder, it was relevant as to the penalty to be imposed by the jury at the trial, and that the suppression of evidence, insofar as it bore on this question, violated due process of law under the Fourteenth Amendment."

From this it is apparent that the legal substance of the conviction formed no part of consideration and determination by the Pennsylvania courts as the matter was presented to them.

■ Aside from the fact that the truth was prevented from reaching the ears of the sentencing judges, had the petitioner a fundamental right to know all the facts surrounding the crimes in which he was involved and with which he stood charged in order that he might have freely exercised his intelligent will in choosing to stand convicted of any of these charges, without compelling his accusers to prove him guilty of them, or in whatever degree of guilt? Our Court of Appeals has already spoken in this regard in United States ex rel. Almeida v. Baldi et al., 195 F.2d 815. At page 819, Judge Biggs stated that while the jury had the power of life and death over Almeida, it was essential that all evidence be presented in order to provide a fair hearing and that the suppression of evidence favorable to Almeida amounted to a denial of due process. In Curran v. State of Delaware,

C.A.3, 1958, 259 F.2d 707, 711, it was stated:

"* * * the trial of a capital case, or indeed any other trial, no longer can be considered properly a game of wits and skill. It is clear that men on trial for their lives are entitled to all pertinent facts relating to their defense and that no witness is entitled to constitute himself the judge of what the court shall hear."

Nor is a prosecuting attorney in such a superior position that he can constitute himself as a censor or convertor of vital evidence which ought to come to the ears of a judge in the trial of a criminal case. We must here be reminded of what the Supreme Court said in Hysler v. State of Florida, 315 U.S. 411, at page 413, 62 S.Ct. 688, at page 690, 86 L.Ed. 932 (1942):

"The guides for decision are clear. If a state, whether by the active conduct or the connivance of the prosecution, obtains a conviction through the use of perjured testimony, it violates civilized standards for the trial of guilt or innocence and thereby deprives an accused of liberty without due process of law."

There is ample authority of what may or may not constitute a denial of due process as based upon false testimony or suppressed evidence.

In Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court granted certiorari to the Supreme Court of Illinois. At page 269, 79 S.Ct. at page 1177, Mr. Chief Justice Warren stated, "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment * * *."

In Ashley v. State of Texas, 319 F.2d 80, C.A.5, 1963, the District Attorney failed to disclose to counsel for the defendant charged with murder, the existence of opinions of a psychiatrist and psychologist engaged by the state, to the effect that the defendant was legally

incompetent. This was held to amount to a denial of due process.

In the United States ex rel. Meers v. Wilkins, 326 F.2d 135, C.A.2, 1964, the failure by the prosecution to make known to the defense the existence of two disinterested eye witnesses who would have testified that the defendant was not a participant in a robbery as charged, amounted to the denial of due process of law.

In Application of Kapatos, 208 F. Supp. 883 (D.C.1962), it was held that the withholding by the state of the testimony of a witness that the defendant who was convicted of murder was not one of the two men whom the witness had seen running to an automobile in the vicinity after the victim had been killed, was so prejudicial to the defendant as to amount to a denial of due process.

In United States ex rel. Jackson v. Rundle, 219 F.Supp. 538 (D.C.1963), the District Attorney had made material misstatements to the Court regarding the sworn testimony of one who had named the relator as a participant in all three robberies, when in fact the record, which had been referred to, named another person as a co-felon.

In addition to the authority contained in our own Circuit in the Almeida and Curran cases, there is also the authority contained in United States of America ex rel. Thompson v. Dye, C.A.3, 1955, 221 F.2d 763. Here Thompson was held for murder and at his trial, the District Attorney failed to call a police officer who would have testified to the intoxicated condition of Thompson at or near the time of the crime. In open court, the prosecuting attorney made this statement: "'At this time I could call a few other police officers who *would corroborate what has already been testified to.* I see no reason why we should merely prolong the testimony now when the witnesses are not here.' (Emphasis supplied)." The statement as made was not true for the reason that the police officer who might have testified to Thompson's intoxicated condition was in court and his testimony would have been contradic-

tory rather than corroborating. Judge McLaughlin in this case said at page 767: "It was substantial evidence which should have been but never was submitted to the jury (the only tribunal entitled to pass upon it) in connection with what the court did charge was to the effect of the drunkenness of Thompson or that he was under the influence of marijuana or a drug at the time of the killing."

■ From these authorities it appears that it is repugnant to our justice that we should permit an accused to be stamped as guilty on perjured, false or suppressed evidence.

■ In considering Hough's petition, we start with the circumstances existing before Hough's conviction. We consider Hough's plea of guilty as a conviction, for the entering of a plea of guilty by a defendant to charges as contained in an indictment is in itself a conviction. It is equivalent to a conviction at the hands of a jury. Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L. Ed. 1009, 1927; Hudgins v. United States, 340 F.2d 391, C.A.3, 1965; Gawantka v. United States, 327 F.2d 129, C.A.3, 1964; United States v. Gallagher, 183 F.2d 342, C.A.3, 1950.

■ Criminals ought not to go unpunished. But there is a method for punishing them—the Constitutional method—which must be availed, and which when availed will be more efficacious as it is understandingly and energetically applied. It is fundamental with us as a nation that no person may be accused of crime unless he is charged with crime, and unless he has an opportunity to face his accusers, and further, that no person may be condemned as a criminal unless and until he is proven so beyond a reasonable doubt by competent evidence. This is our justice. As a nation we cherish fair play and a fair contest. Today we sustain our beliefs abroad with the lives of our young men. As long as we practice forthright justice the bedrock foundation of our government can never be shaken. So it is that

we must abhor deceit and concealment in its processes. We know that a trial based on false or suppressed evidence is no trial at all. False or suppressed evidence can neither convict nor condemn.

 Our law makes inadmissible in evidence any confession by an accused when it is procured by compulsion or without full knowledge by the accused of what he is doing when he makes such a confession. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). No less will our law permit an accused to plead guilty where he does not do so openly, voluntarily and knowingly. Kercheval v. United States, supra; United States ex rel. Slebodnik v. Com. of Pennsylvania et al., 343 F.2d 605, C.A.3, 1965. As was said by Judge Freedman in United States ex rel. McDonald v. Commonwealth of Pennsylvania, 343 F.2d 447, at page 451, C.A.3, 1965: "Indeed, the two are inevitably entwined, for a hearing of a plea of guilty is a critical stage in the proceedings against the accused, * * *."

 In Pennsylvania at the trial of one charged with murder, it is customary for the trial judge to instruct the jury on the various verdicts of guilty which they may find. He includes instructions for verdicts of murder of the first degree, in the alternative with instructions for verdicts of murder of the second degree and voluntary manslaughter. Commonwealth v. Chavis, 357 Pa. 158, 172, 53 A.2d 96 (1947); Laub's Pennsylvania Trial Guide, § 618.3 et seq. The court should instruct the jury as to their power and duty to determine from the evidence the grade or degree of the crime of which the accused may be found guilty. 41 C.J.S. Homicide § 398 a; Commonwealth v. Kovovic, 209 Pa. 465, 58 A. 857 (1904); Commonwealth v. Sheets, 197 Pa. 69, 46 A. 753 (1900).

 It is, therefore, not unreasonable to conclude that if Hough had in 1947 not chosen to plead guilty, he would have had the benefit of instructions given to a jury of its right to impose lesser convictions than what he had himself undertaken. Nor would it have been too improbable for the jury to have found him guilty of a lesser crime than first degree murder, if all of the evidence had been truthfully and fully presented for the consideration of the jury. No less, either, ought we leave to surmise what the three-sentencing judges would have done had the truth been presented to them. It is a serious and proper matter for inquiry even at this date. It is in any event a federal question relating to due process and fair trial.

 Because of the prosecutor's high duty of seeing to it that criminal justice is dispensed legally and conscionably in our courts, courts must be the first to condemn, particularly, any law officer who resorts to corrupt practices in the name of justice or for the sake of justice to procure what he considers justice. This follows from the fact that the law has vested much power in prosecuting officers, whether they are district attorneys or United States attorneys. An abuse of such power is constitutionally forbidden that it may not become oppressive. Whatever the motives of the District Attorney were in suppressing the evidence concerning the fatal bullet or in permitting confused evidence to come before the courts, it was done and it was done intentionally, nevertheless. Since the conviction itself is now under attack based on such premises, all of the evidence in this case should be re-examined to determine whether or not the petitioner was deprived of a fair trial and due process of law as guaranteed to him by the Constitution.

 However, the question here raised was never presented to the State courts.

The question which follows, secondly, then is, Under the circumstances as here presented, did the petitioner exhaust his State remedies? In all fairness to the State courts, this question should be first answered. In the "Petition For Writs

of Coram Nobis and of Habeas Corpus" to the Court of Common Pleas of Philadelphia, No. 3489 December Term, 1959, the question as it was presented was on the changed attitude of the Pennsylvania Supreme Court as reflected in the then recently decided Redline case (391 Pa. 486, 137 A.2d 472), regarding the Pennsylvania felony-murder doctrine. In the "Brief For Appellant", before the Supreme Court of Pennsylvania at page 4, while mention was made of the evidence deliberately suppressed by the Commonwealth, the reference was made in relation to the character or degree of the penalty.

At page 5 of the typewritten brief, the petitioner presented the matter in this way:

> "The request for the granting of the writ of habeas corpus raises the more fundamental question of whether the continued incarceration of this appellant on a First Degree Murder charge can be sustained consistently with due process under either the Fourteenth Amendment or the similar provision of the Pennsylvania Constitution *in view of the changed attitude of this Court toward the felony-murder doctrine."*
> (Emphasis added)

As a second ground, the typewritten brief, at page 15, raises the question of suppression of material evidence by the prosecuting officials as an independent ground for relief in mitigation of the penalty, but not as an out-and-out attack upon the validity of the basic judgment of conviction.

This may present a thin thread of difference—but a difference nevertheless. Were the State courts ever faced with the same question which is here presented before me? The previous attack by Hough was on the degree and justification of the sentence which he received as reflected by the Redline and Almeida cases, rather than an attack on the substance of the conviction. Under this circumstance, Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), would be controlling. In

Brady, the petitioner had been convicted of first degree murder. Brady complained of suppressed evidence, and the Supreme Court held that such evidence was pertinent only as it affected the penalty.

In sum total the records relating to all the Pennsylvania State courts indicate that the question of the validity of the judgment of conviction as affected by false or suppressed evidence never had been placed before them for a determination.

In a search of all of the records, I find the following, as it was set out in the application to the United States Supreme Court for a writ of certiorari to the Supreme Court of Pennsylvania, Commonwealth ex rel. Hough v. Maroney, 366 U.S. 971, 81 S.Ct. 1936, 6 L.Ed.2d 1260, certiorari denied. At page 2 of the typewritten application this is contained:

> "QUESTION PRESENTED FOR REVIEW
> Whether the state courts may, consistently with due process of law under the Fourteenth Amendment, deny without hearing a petition for writs of habeas corpus and coram nobis, where it is alleged that petitioner's plea of guilty to murder was induced by the deliberate suppression of evidence favorable to the petitioner."

Here, we have, raised for the first time, an attack upon the substantive conviction as being "induced by the deliberate suppression of evidence favorable to the petitioner."

This is the federal question now before me. However, is the question so raised one which I am required to presently determine? As here presented, should a United States District Court entertain jurisdiction (a) in order to make a final decision in the matter or (b), otherwise, to permit reference of the question to the State courts in order that they may be given a prior opportunity of determining the question here pointedly raised by the petitioner. Fed-

eral questions are as much a matter for determination of state courts as for federal courts. United States ex rel. Dalton v. Myers, 342 F.2d 202, C.A.3, 1965.

In Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court elaborately defined the powers of federal courts in granting habeas corpus relief. In discussing the question of exhaustion of remedies and the requirement that remedies be first attempted in state courts, Mr. Justice Brennan, at pages 419–420, 83 S.Ct. at pages 838–839, said:

"These decisions fashioned a doctrine of abstention, whereby full play would be allowed the States in the administration of their criminal justice without prejudice to federal rights enwoven in the state proceedings. Thus the Court has frequently held that application for a writ of habeas corpus should have been denied 'without prejudice to a renewal of the same after the accused had availed himself of such remedies as the laws of the state afforded * *.' [State of] Minnesota v. Brundage, 180 U.S. 499, 500–501 [21 S.Ct. 455, 45 L.Ed. 634]. See also Ex parte Royall, supra, 117 U.S. [241] at page 254, [6 S.Ct. 734, 29 L.Ed. 868]. With refinements, this doctrine requiring the exhaustion of state remedies is now codified in 28 U.S.C. § 2254. But its rationale has not changed: 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation * * *. Solution was found in the doctrine of comity between courts, a doctrine which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, had had an opportunity to pass upon the matter.' Darr v. Burford, 339 U.S. 200, 204 [70 S.Ct. 587, 94 L.Ed. 761]. The rule of exhaustion 'is not

one defining power but one which relates to the appropriate exercise of power.' Bowen v. Johnston, 306 U.S. 19, 27 [59 S.Ct. 442, 83 L.Ed. 455]. Cf. Stack v. Boyle, 342 U.S. 1 [72 S.Ct. 1, 96 L.Ed. 3]; Frisbie v. Collins, 342 U.S. 519 [72 S.Ct. 509, 96 L.Ed. 541]; Douglas v. Green, 363 U.S. 192 [80 S.Ct. 1048, 4 L.Ed. 2d 1142]."

The Court held (at page 411, 83 S.Ct. at page 834) when due process of law as it embraces fundamental conception of a fair trial is actually subverted, the federal court has jurisdiction to issue the writ. Such is the case for instance in which one is convicted upon evidence which includes his coerced confessions (page 427, 83 S.Ct. page 842). A federal court has no power to revise a state court judgment. The power is in the federal court to act only on the body of the petitioner (page 431, 83 S.Ct. page 844).

Fay v. Noia emphatically states that in a habeas corpus, the jurisdiction in the federal court is broad. Nevertheless, I do not deem jurisdiction to be so definite as to exclude the State courts from consideration and determination of the federal question here raised. And this is so in spite of the fact that it may be argued that the State courts have already acted upon the matter, even though not with the specificity and nicety with which a direct question would have in all probability resulted in a direct answer.

I am aware of what Judge Hastie said in In re Ernst's Petition, C.A.3, 1961, 294 F.2d 556, 561, "* * * Denial of a state prisoner's petition for habeas corpus on its merits remains permissible under Section 2241 even though state remedies may not have been exhausted. * * *"

I am also aware of what Chief Judge Biggs said in United States ex rel. Almeida v. Baldi et al., 195 F.2d 815, at page 825:

"In conclusion we state that we are not unmindful of the delicate bal-

ance which exists, and which must be preserved, between the Courts of the States and those of the National Government. Every conflict between these courts is by its very nature unseemly and must be avoided if possible. But the judges of the court below and this court, like those of the Commonwealth of Pennsylvania, have duties to perform. Every federal judge takes solemn oath to discharge those duties 'agreeably to the Constitution and laws of the United States.' "

In Fay v. Noia, supra, it was stated (372 U.S. page 438, 83 S.Ct. page 849) that " * * * [T]he federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts * * *." This does not appear to be the situation here, since there was no deliberate intention by the petitioner to by-pass the State courts. Rather, it appears there the petitioner had the impression that the question had been presented. The very careful examination which I have given the entire record persuades me that it was not so presented.

However, under the circumstances deference should be given to the State courts so that they may be given the opportunity to inquire into, consider and determine the question as here presented. I have duly considered the fact that the indictment is now eighteen years old and that some of the evidence is stale. However, the record presents a great deal of evidence which is still available; and that includes the record of this present proceeding.

By requiring the petitioner to resort to a further remedy in the State courts, there will be some necessary delay but the petitioner cannot complain of this because, first, he has heretofore failed to have the present federal question properly presented to the State courts, and second, because he, himself, has delayed considerably in the various court processes.

Accordingly, I shall retain jurisdiction in this case and withhold final decision until the petitioner shall have had a reasonable opportunity to present the federal question to the State courts, or to allow the petitioner time to procure a review by our Court of Appeals of any questions here presented. If the petitioner fails to act within a period of sixty days from the date of the order, his petition will be dismissed. In the event the petitioner chooses to act, he will be required to supply this record with such additional pleadings as shall indicate the procedures undertaken.

It is to be understood that should the petitioner pursue further remedies in the State courts, it shall be without prejudice to the right of the Commonwealth of Pennsylvania to proceed on the indictment of charges as filed. The indictment is not here under attack. Neither shall the petitioner have the right to claim double jeopardy in any proceeding against him by the Commonwealth on the original indictment.

It will be so ordered.